UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

AFSH'ARI D. MARCHE,            )
                              )
              Plaintiff,      )
                              )
        v.                    )      No. 4:05CV598 CAS
                              )                  (FRB)
JO ANNE B. BARNHART,          )
Commissioner of Social Security, )
                              )
              Defendant.      )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is before the Court for a second time on
plaintiff's appeal of an adverse ruling by the Social Security
Administration.   All pretrial matters were referred to the
undersigned United States Magistrate Judge pursuant to 28 U.S.C. §
636(b) for appropriate disposition.

**I.  Procedural Background**

On April 20, 2000, plaintiff Afsh'ari D. Marche filed an
application for Disability Insurance Benefits pursuant to Title II
of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr-II 406-
10),[1] and an application for Supplemental Security Income pursuant
to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.
(Tr-II 354-56), in which she claimed she became disabled and unable

_____

[1]The administrative transcript in this cause was submitted by
the Commissioner on November 3, 2005, in two volumes.  Pages
referenced from volume I of the transcript are designated herein as
"Tr-I" and those referenced from volume II are designated as "Tr-
II."

to work on February 13, 1998.[2]  The Social Security Administration

denied plaintiff's claims for benefits on June 22, 2000.  (Tr-II

377.)  A hearing was held before an Administrative Law Judge (ALJ)

on October 23, 2000, at which plaintiff testified and was

represented by counsel.  (Tr-II 19-47.)  On November 5, 2001, the

ALJ issued a decision denying plaintiff's claims for benefits,

specifically finding that plaintiff could perform her past relevant

work.  (Tr-II 12-18.)  On February 27, 2002, the Appeals Council

denied plaintiff's request for review of the ALJ's adverse decision

(Tr-II 2-3), thus making the ALJ's decision the final decision of

the Commissioner.  42 U.S.C. § 405(g).

On May 7, 2002, plaintiff appealed the Commissioner's

adverse decision to this Court, see Marche v. Barnhart, Cause No.

4:02CV628 CAS (E.D. Mo. 2002) ("Marche I"), and raised the

following arguments to support her request that the Commissioner's

decision be reversed:  1) that the ALJ failed to explain the

rationale for his determination of plaintiff's residual functional

capacity (RFC), specifically arguing that the ALJ failed to cite

any evidence to support his determination that plaintiff was

limited to lifting no more than ten pounds and that plaintiff's

non-exertional impairments resulted in only a limitation to avoid

high stress, and that there was no evidence upon which the ALJ

_____

[2]Plaintiff had previously applied for benefits which were
denied by the Social Security Administration on September 17, 1998,
and not pursued further.  (Tr-II 48-352.)

2

could base his RFC determination inasmuch as the ALJ discredited the medical evidence of record as well as plaintiff's testimony (Marche I, *Pltf.'s Brief* at pp. 11-12); 2) that the ALJ failed to compare plaintiff's past relevant work to her RFC on a function-by-function basis (id. at p. 13); and 3) that the ALJ failed to properly weigh the opinions of plaintiff's treating physician (id. at pp. 13-14). The Commissioner answered each of these specific claims in her Brief in Support of the Answer.

The district court referred the matter to the undersigned pursuant to 28 U.S.C. § 636(b), whereupon a Report and Recommendation issued August 7, 2003. In the Report and Recommendation, the undersigned summarized the evidence of record, addressed plaintiff's arguments and made recommendations to the district court as to each of plaintiff's claims, and, specifically 1) that the ALJ's determination of plaintiff's RFC, including the finding that plaintiff was non-exertionally limited to an environment not involving high stress, was supported by substantial evidence on the record as a whole; 2) that the ALJ's finding that plaintiff could perform her past relevant work was not supported by substantial evidence on the record as a whole given the ALJ's failure to make specific findings regarding the demands of plaintiff's past relevant work; and 3) that the weight given by the ALJ to the opinions of plaintiff's treating physician was supported by substantial evidence on the record as a whole. (See Marche I, *Report and*

3

*Recommendation* at pp. 47-55.) In light of the lack of substantial evidence on the record to support the ALJ's finding that plaintiff could perform her past relevant work, the undersigned recommended to the district court that the cause be remanded to the Commissioner "for the specific purpose of making explicit findings regarding the physical and mental demands of claimants [sic] past relevant work and then determining whether claimant's RFC precludes her from such work." (Id. at p. 56.) Neither party filed written objections to this Court's Report and Recommendation. In an Order entered September 4, 2003, United States District Judge Charles A. Shaw sustained, adopted and incorporated the Report and Recommendation into his opinion and ordered the matter remanded to the Commissioner "for the specific purpose of making explicit findings regarding the physical and mental demands of claimant's past relevant work and then determining whether claimant's RFC precludes her from such work." Marche I, *Order* at p. 1.) Judgment was entered that same date. No appeal was taken by either party from the district court's Judgment.

Upon remand to the Commissioner, the Appeals Council vacated the previous decision of the Commissioner and remanded the matter to an ALJ to conduct further proceedings consistent with the Order of the district court in Marche I. Thereafter, a subsequent hearing was held before an ALJ on October 5, 2004, at which plaintiff testified and was represented by counsel. A vocational

expert also testified at the hearing. (Tr-I 15-63.) On December 15, 2004, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 3-14.) The Appeals Council did not review the ALJ's decision. The ALJ's adverse decision of December 15, 2004, thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g). Plaintiff now seeks judicial review of this second adverse decision.

## II. The ALJ's Decision

In his decision of December 15, 2004, the ALJ recited the relevant procedural history of the case and determined, on the evidence already of record in addition to evidence submitted subsequent to remand, that plaintiff was not disabled. Specifically, the ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on September 18, 1998, but was no longer insured after December 31, 2003. The ALJ found that plaintiff had not engaged in substantial gainful activity since September 18, 1998. The ALJ found plaintiff's impairments of osteoporosis, osteopenia, bipolar disorder, osteoarthritis, and history of right rotator cuff repair to be severe, but that such impairment(s) or combination of impairments did not meet or medically equal an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. The ALJ further found plaintiff's allegations not to be credible. The ALJ determined that from September 18, 1998, through November 5, 2001, plaintiff had the RFC

to lift or carry ten pounds occasionally, occasionally stand or walk up to two hours in an eight-hour workday, and sit six hours in an eight-hour workday; but that she had to avoid highly stressful activities. With this RFC, the ALJ determined plaintiff to have been able to perform her past relevant work as a secretary from September 18, 1998, through November 5, 2001. With respect to the period of November 6, 2001, through the date of the decision, the ALJ found plaintiff to have the RFC to lift or carry ten pounds occasionally, stand or walk up to two hours in an eight-hour workday, and sit six hours in an eight-hour workday; but that she could reach overhead with her right arm on a less-than-occasional basis, could negotiate ramps or stairs only on a less-than-occasional basis, could not climb, and could engage in only less-than-occasional contact with the general public. The ALJ determined that this RFC prevented plaintiff from performing any of her past relevant work. (Tr-I 13.) Considering plaintiff's age, education and the testimony of the vocational expert adduced at the hearing, the ALJ determined that plaintiff was able to perform other work existing in significant numbers in the national economy. The ALJ thus determined plaintiff not to be disabled at any time since September 18, 1998. (Tr-I 13-14.)

### III.  Law of the Case

As an initial matter, the undersigned notes that in the instant appeal, plaintiff challenges the ALJ's RFC determination

for the period of September 18, 1998, through November 5, 2001, specifically arguing that the mental non-exertional limitation of needing to avoid "highly stressful activities" is too vague to permit a finding that plaintiff retained the RFC to perform her past relevant work. In response, the Commissioner argues that the district court's determination in Marche I settled the issue of plaintiff's RFC during the period of September 18, 1998, through November 5, 2001, and thus that the "law of the case" doctrine bars relitigation of the issue in the present action. For the following reasons, the Commissioner's argument is well taken.

At the administrative level in Marche I, the ALJ determined that plaintiff had the "exertional residual functional capacity to perform the requirements of work except for prolonged walking and standing, and lifting more than 10 pounds. There is a non-exertional limitation in that the claimant cannot perform activities which are highly stressful." (Tr-II 18.) On appeal of this decision, plaintiff challenged the ALJ's RFC finding, arguing first, that the ALJ failed to cite evidence to support the finding and second, that no evidence in the record supported the finding inasmuch as the ALJ determined to discredit all evidence of record. The Court rejected this argument and found the ALJ's RFC determination to be based on substantial evidence on the record as a whole, including the non-exertional limitation of avoiding activities which are highly stressful:

The ALJ also determined that the claimant was non-exertionally limited to an environment not involving high stress. This determination too is supported by the record. The claimant's treating psychiatrist, Dr. Lewis reported that the claimant was markedly limited in her ability to cope with stress. The ALJ accepted this medical opinion and used it to determine the claimant's mental RFC. To the extent that the claimant is asserting that the ALJ should have adopted other findings of Dr. Lewis, namely that the claimant was constantly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, in determining the claimant's RFC, the undersigned notes that the ALJ properly rejected that opinion. . . .

Some medical evidence must support the ALJ's determination of a claimant's RFC. The assessments of Dr. Leung and Dr. Lewis constitute such medical evidence. An ALJ is to determine RFC based also on descriptions of the claimant as to her limitations and on the observations of others as to her limitations. 20 C.F.R. § 404.1545. . . . The ALJ's determination that the claimant can perform all work activities except for prolonged walking and standing, lifting more than ten pounds, and work in a high-stress environment, is reasonable[.] . . . As such, the undersigned finds that the ALJ's RFC determination was based on substantial evidence on the record as a whole.

Marche I, *Report and Recommendation* at pp. 49-50.

No objections were made to this finding and the district court incorporated this finding into its final Order. Upon this finding, the Commissioner was specifically directed to compare plaintiff's RFC with the specific demands of plaintiff's past relevant work to

determine whether plaintiff could perform such work.  No appeal was
taken from these findings and determinations.

"'The law of the case doctrine prevents the relitigation
of a settled issue in a case and requires courts to adhere to
decisions made in earlier proceedings . . . .'" Brachtel v. Apfel,
132 F.3d 417, 419 (8th Cir. 1997) (quoting United States v. Bartsh,
69 F.3d 864, 866 (8th Cir. 1995)).  This doctrine applies to
administrative agencies on remand.  Id.  As such, on a case
remanded from the district court, an ALJ is bound by the findings
of the district court and is not free to reconsider any question
finally disposed of by the court.  See Pediatric Specialty Care,
Inc. v. Arkansas Dep't of Human Servs., 364 F.3d 925, 931 (8th Cir.
2004); Brachtel, 132 F.3d at 419-20; see also Steahr v. Apfel, 151
F.3d 1124, 1125 (8th Cir. 1998).  Where an issue remains unresolved
by the reviewing court's order, however, that issue may be
revisited on remand.  Pediatric Specialty Care, 364 F.3d at 931.

A review of the record in this case shows the ALJ upon
remand to have properly considered the issue of plaintiff's RFC
between September 18, 1998, and November 5, 2001, to be resolved by
Marche I and not to remain open for further consideration.  (Tr-I
55.)  Indeed, the issue of plaintiff's RFC was fully litigated in
Marche I and the district court's finding thereon provided the
basis upon which the Commissioner was ordered to conduct specific
proceedings upon remand.  Cf. Brachtel, 132 F.3d at 420 (in finding

law of the case did *not* apply, Eighth Circuit noted that the district court did not specifically instruct ALJ to proceed on remand based upon a finding of fact that the claimant needed to lie down). While plaintiff acknowledges the finding in <u>Marche I</u> that the ALJ's RFC determination was supported by substantial evidence on the record, she argues that upon remand, the subsequent ALJ and the vocational expert both indicated at the administrative hearing that the non-exertional limitation of having to avoid highly stressful environments may be too vague to provide a basis upon which to accurately determine what work, if any, plaintiff could perform:

> Q [by ALJ]  If you would assume for the purposes of a hypothetical question a hypothetical worker able to lift and carry less than or equal to 10 pounds, who could stand and/or walk, assuming normal breaks, for up to two hours in an eight-hour workday, sit, assuming normal breaks, for up to six hours in an eight-hour workday and who should not be involved in work activities or work that involves – I'm quoting from the earlier decision that was I think at least in part ratified by the courts so that's why I'm using this phrase – highly stressful activities.  If you were to use those factors, would that allow the performance of any of the past work? I know that's a somewhat vague term but I'm using what's already in the record.
>
> A [by VE]  What's stressful to one may not be stressful to –
>
> Q    I understand.
>
> A    Yes.  Secretary and general clerk could be performed.

(Tr-I 55.)

10

Upon remand, the ALJ relied upon the RFC determination made by the first ALJ, and affirmed by the district court's order in Marche I, that plaintiff needed to avoid highly stressful environments. While the ALJ may have suggested that such a term could be considered "somewhat vague," the undersigned notes that the vocational expert nevertheless unequivocally testified to work such a claimant could perform with the limitation. Further, in accordance with the specific instruction of the district court in Marche I, the ALJ made explicit findings regarding the physical and mental demands of plaintiff's past relevant work as a secretary by referring to the specific job description from the *Dictionary of Occupational Titles*, see Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999), and then determined, with the assistance of vocational expert testimony, that plaintiff's defined RFC did not preclude her from performing such work. (Tr-I 12.) Given that the plaintiff's RFC for the period of September 18, 1998, through November 5, 2001, had been resolved by the district court's Order in Marche I, the ALJ upon remand was precluded from reopening the issue and did not err in failing to do so.

Accordingly, plaintiff's claim that the ALJ erred in making the vague determination that plaintiff had a non-exertional limitation in needing to avoid highly stressful activities is barred by the law of the case and should be denied.

### IV.  Administrative Hearing Before the ALJ Upon Remand

A.   <u>Plaintiff's Testimony</u>

At the hearing on October 4, 2004, plaintiff testified in response to questions posed by the ALJ and counsel.  At the time of the hearing, plaintiff was fifty-one years of age.  (Tr-I 19.) Plaintiff stands five feet, nine inches tall and weighs 238 pounds. (Tr-I 31.)  Plaintiff is married and lives in a home with her eighty-eight year old mother who experiences some degree of Alzheimer's.  (Tr-I 19, 46.)  Plaintiff received a college degree in Education.  Plaintiff has no current sources of income.  (Tr-I 19.)

Plaintiff testified that she last worked by training for the 2000 census but that she did not continue with the training because it was too stressful for her to deal with people, to go to people's homes, and to leave her telephone number for those persons not at home.  (Tr-I 20.)  Plaintiff testified that she temporarily worked performing clerical work for two or three months prior to her census training but that she stopped such work because of the stress involved in the lengthy and detailed nature of some of the tasks.   (Tr-I 20-21.)   Plaintiff testified that prior to her clerical work, she trained as a food handler for one day but did not return because dealing with a lot of people made her nervous. (Tr-I 21.)  Plaintiff testified that prior to such training, she worked as an elementary school teacher in the St. Louis public

schools.   Plaintiff  testified  that  she  left  such  employment  on
February 13, 1998, because of hypertension, stress, depression, and
bone  problems.   Plaintiff  testified  that  for  a  five-  or  six-year
period between teaching jobs, she performed clerical work such as
answering  the  telephone,  computer  work,  faxing,  working  with
invoices, and ordering supplies.  (Tr-I 22.)

Plaintiff  testified  that  she  could  not  return  to  teaching
because she has problems "dealing with detail," gets very nervous
and upset, does not like to be around a lot of people, and avoids
crowded situations.  Plaintiff testified that she goes into a panic
attack in such circumstances.  (Tr-I 23.)  Plaintiff testified that
she  experiences  hot  flashes,  dry  mouth,  a  racing  heart,  and
sweating  during  a  panic  attack.   (Tr-I  26.)   Plaintiff  also
testified that she did not believe she could return to performing
clerical work because of her frustration with the detail of the
work involved.   Plaintiff  testified  that  she  considers  compiling
reports,  performing  computer  work,  meeting  deadlines,  and
performing multiple tasks assigned by her boss to be too detailed
and frustrating to perform.  (Tr-I 27.)  Plaintiff testified that
she loses interest performing a task after fifteen minutes to half
an hour.  (Tr-I 40.)

Plaintiff testified that her ability to deal with stress
and  with  people  had  worsened  during  the  previous  six  years.
Plaintiff testified that simple tasks can cause her stress and that
she has problems with details.  (Tr-I 24.)  Plaintiff testified

13

that she is claustrophobic and starts to have a panic attack when she is in an enclosed space with a certain number of people. Plaintiff testified that it is not necessarily the interaction with people that causes her upset but rather just being around people. Plaintiff testified that she has experienced this sensation for three to four years. (Tr-I 25.) With respect to details, Plaintiff testified, as an example, that she is unable to learn computer functions unless someone physically shows her because she is unable to absorb the written instructions and she experiences stress and anger as a result. Plaintiff testified that she has experienced this type of problem for three to four years. (Tr-I 26.) Plaintiff testified that she takes medication and undergoes counseling for her condition. (Tr-I 24.)

Plaintiff also testified that she has suffered from depression since 1996 and that she withdraws and does not want anyone around her. (Tr-I 26.) Plaintiff testified that she takes medication for the condition. (Tr-I 26.) Plaintiff testified that she has also been diagnosed with bipolar disorder which manifests itself through extreme emotion. (Tr-I 27-28.)

Plaintiff testified that her worst physical condition is hypertension with which she would occasionally experience dizziness, but that the condition has been controlled with medication for three or four months. (Tr-I 28.)

Plaintiff also testified that she is in constant pain due to osteoarthritis and osteoporosis. (Tr-I 28.) Plaintiff

14

testified that she has had osteoarthritis for five years and that she experiences pain daily in her back, hip, knee, and shoulder. (Tr-I 29.) Plaintiff testified that cold weather and immobility worsen the pain. (Tr-I 30.) Plaintiff testified that she was involved in an accident two years prior which broke her legs and her back and caused injury to her rotator cuff, resulting in constant pain. (Tr-I 29, 31.) Plaintiff testified that she must rise slowly when getting out of bed because her back is stiff and "locked up." (Tr-I 32.) Plaintiff testified that her back pain is at a level eight on a scale of one to ten, and that overexertion, bending, and sitting for too long exacerbate the pain. (Tr-I 49.) Plaintiff testified that medication sometimes helps relieve the pain, bringing it down to a level four. (Tr-I 29, 50.) Plaintiff testified that her hip pain is at a level six on a scale of one to ten, and that overexertion, bending, and climbing stairs exacerbate the pain. Plaintiff testified that medication brings the pain down to a level three or four. (Tr-I 50.) Plaintiff testified that her knee pain is at a level six on a scale of one to ten, and that climbing stairs and walking too much exacerbate the pain. (Tr-I 50-51.) Plaintiff testified that medication sometimes helps relieve the pain, bringing it down to a level three. (Tr-I 50.) Plaintiff testified that her shoulder pain is constantly at a level five on a scale of one to ten, and that use of the arm, raising the arm, or overextension of the arm exacerbate the pain. Plaintiff testified that nothing relieves or reduces her shoulder pain. (Tr-

I 51.)  Plaintiff testified that her pain medication adversely affects her liver.  (Tr-I 51-52.)

Plaintiff testified that she was diagnosed with osteoporosis in 1996.  (Tr-I 30.)  Plaintiff testified that she experiences pain in certain places where she believes weight is straining thinning bone.  Plaintiff testified that she has gained approximately seventy pounds during the previous two years.  (Tr-I 31.)  Plaintiff testified that she has made many attempts to lose weight but that she cannot be too active because of her pain.  Plaintiff testified that she underwent gastric bypass surgery in 1998 which helped her to lose weight at that time.  (Tr-I 31-32.)

Plaintiff testified that she experienced a rotator cuff tear in her right shoulder for which she underwent two surgeries.  Plaintiff testified that she believes her shoulder is "still not right" and that she just lives with the pain.  (Tr-I 38.)

Plaintiff testified that she also suffers from liver disease which results in pain and bowel disorders.  Plaintiff testified that she takes medication for the condition only when she experiences increased pain.  (Tr-I 44.)

Plaintiff testified that she suffers from mineral loss due to irregularities in her metabolism but experiences no symptoms from the condition.  Plaintiff testified that she takes medication, including intravenous infusions, and that she last had an infusion in December.  Plaintiff testified that she has missed many medical appointments because she cannot keep track of all of them.  (Tr-I

32, 41-42.)

As to her daily activities, plaintiff testified that she wakes in the morning between 6:30 and 7:00 a.m. and goes to bed between 10:00 and 11:00 p.m. (Tr-I 33.) Plaintiff testified that she rarely sleeps through the night. (Tr-I 33-34.) Plaintiff testified that upon waking, she gets herself ready for the day, including bathing every day, and then sometimes gets dressed. Plaintiff testified that she stays in her robe on some days and gets dressed maybe three days out of the week. (Tr-I 33.) Plaintiff testified that she attends church on Sunday but only stays for one hour of the three-hour service. (Tr-I 33, 35A.) Plaintiff testified that throughout the day, she will clean the house for three to four hours, which includes dusting, cleaning the toilet, washing dishes, vacuuming, and occasional laundry. (Tr-I 33-34, 48.) Plaintiff testified that she occasionally reads. (Tr-I 33-34.) Plaintiff testified that she drives four days a week on approximately eight separate occasions to places such as the doctor's office, the grocery store and to check on her mother, for a total of approximately forty or fifty miles. (Tr-I 34, 53.) Although plaintiff acknowledged that she lived with her mother, she testified that she "still . . . check[s] on her" and takes her places, and that she also checks on her husband. (Tr-I 34, 46.) Plaintiff testified that she is scared to drive because she gets nervous, is not focused and has had nine accidents in two years. (Tr-I 34-35.) Plaintiff testified that she cooks for herself and

her mother. Plaintiff testified that she is unable to do yard work. (Tr-I 35.) Plaintiff does not belong to or participate in any social clubs or organizations nor engages in any hobbies. (Tr-I 35A, 45.) Plaintiff testified that in May 2002, she probably engaged in crafts, singing and painting at home, but that she lost interest in such activities in 2000 or 2001. (Tr-I 45-46.) Plaintiff testified that she currently enjoys home decorating, such as picture framing, making collages, and flower arrangement. (Tr-I 46.) Plaintiff testified that she visits with her grandchildren once or twice a month. (Tr-I 35A.) Plaintiff testified that she talks with her friends on the telephone approximately ten or eleven hours each week and sometimes watches television. (Tr-I 36.) Plaintiff testified that her computer stopped working within the previous two months, but that she had worked on her computer for up to one hour each day prior to that time. (Tr-I 52.) Plaintiff testified that she receives help with shopping and that carrying a bag causes her pain and to be out of breath, but that she is okay. (Tr-I 37.)

Plaintiff testified that she can sit for an unlimited amount of time as long as she is not having a panic attack. Plaintiff testified that she can stand for five to fifteen minutes before her back, hip and knee begin to hurt, and that she must take a two- or three-minute break before she can stand again. (Tr-I 37.) Plaintiff testified that she can walk for only ten or fifteen minutes (Tr-I 40) and that, on a flat surface, she can take only

fifteen to twenty steps before she becomes out of breath (Tr-I 37-38). Plaintiff testified that she can take only two or three stairs at a time before she must stop for a break. (Tr-I 37-38.) Plaintiff testified that she climbs stairs in her home two or three times a week because the laundry and food storage is in her basement. (Tr-I 38.) Plaintiff testified that she can lift approximately twenty pounds with her right arm and twenty-five pounds with her left arm. (Tr-I 38-39.) Plaintiff testified that her back condition causes her difficulty with bending and twisting, and that she cannot squat because of eight surgeries performed on her knees. (Tr-I 39.)

Plaintiff testified that she cares for her mother in that she makes sure her mother is eating and drinking, attends to her personal hygiene, and makes sure she does not wander off and remains free from danger. (Tr-I 47-48.) Plaintiff testified that she receives no help in caring for her mother. (Tr-I 47.)

B.   Testimony of Vocational Expert

Barbara Myers, a vocational expert, testified at the hearing in response to questions posed by plaintiff's attorney and the ALJ. Ms. Myers classified plaintiff's past work as a general clerk to be light and semi-skilled; as an elementary teacher to be light and skilled; and as a secretary to be sedentary and skilled. (Tr-I 54.) Ms. Myers testified that all three jobs had transferable skills. (Tr-I 55.) The ALJ then asked Ms. Myers to assume an individual

19

> able to lift and carry less than or equal to
> 10 pounds, who could stand and/or walk,
> assuming normal breaks, for up to two hours in
> an eight-hour workday, sit, assuming normal
> breaks, for up to six hours in an eight-hour
> workday and who should not be involved in work
> activities or work that involves – I'm quoting
> from the earlier decision that was I think at
> least in part ratified by the courts so that's
> why I'm using this phrase – highly stressful
> activities.  If you were to use those factors,
> would that allow the performance of any of the
> past work?

(Tr-I 55.)

Ms. Myers testified that such a person could perform plaintiff's past relevant work as a secretary.  (Tr-I 55-56.)

The ALJ then asked Ms. Myers to assume an individual with the same exertional capacity as to sitting and standing, but that such a person could engage in only less than occasional contact with the general public.  Ms. Myers testified that such a person could not engage in any of plaintiff's past relevant work.  Ms. Myers testified, however, that a person with such a residual functional capacity and who was of plaintiff's age, education and work experience could perform other work such as billing clerk, correspondence clerk and data entry clerk, with such jobs existing at numbers approximating 4,400, 2,000 and 5,500, respectively, within the state; with national numbers existing at 221,000, 84,000 and 250,000, respectively.  (Tr-I 56-57.)  In response to further hypothetical questions posed by the ALJ, Ms. Myers testified that her conclusion would not change if the individual from the second

20

hypothetical had additional factors of engaging in only less than occasional overhead reaching with the dominant arm, no climbing, and less than occasional ramps or stairs. (Tr-I 57.)

Plaintiff's attorney asked Ms. Myers to assume an individual from the ALJ's first hypothetical, with "highly stressful activities" defined as

> those that involve working at deadlines, working with quotas, working in close proximity with coworkers or under close supervision, or having more than – or having occasional or more contact with the public or requiring more than 30 minutes at a time of concentration on detailed work tasks.

(Tr-I 59.)

Ms. Myers testified that such a person could perform unskilled, sedentary work such as document preparer, microfilm and hand packager. (Tr-I 60.) Ms. Myers further testified that if a person needed to avoid all deadlines, that is, would require as much time as needed to complete any possible task, no work would be available. (Tr-I 61-62.)

## V. Medical Records

Plaintiff saw Dr. Collins E. Lewis, a psychiatrist, on March 26, 1997. Dr. Lewis reported that plaintiff was doing well and that she no longer appeared depressed. Dr. Lewis noted that plaintiff was changing her job to remove herself from working for a principal who had caused her difficulties. Dr. Lewis also noted

that plaintiff would be moving to Las Vegas soon.  He noted plaintiff's mental status to be within normal limits and diagnosed her with major depression and possible alcohol abuse.  Dr. Lewis prescribed Prozac,[3] a change from Paxil,[4] at plaintiff's request. (Tr-II 543.)

Plaintiff saw Dr. Lewis again on April 30, 1997, who noted plaintiff to be doing well and not experiencing depression. Dr. Lewis regarded plaintiff's mental status to be within normal limits and continued to diagnose her with major depression and possible alcohol abuse.  Prozac was prescribed.  (Tr-II 542.)

Plaintiff returned to Dr. Lewis on August 13, 1997, and reported that she felt calmer on Prozac.  Dr. Lewis noted that plaintiff's mental status was within normal limits and he continued to diagnose her with major depression and possible alcohol abuse. He prescribed Prozac.  (Tr-II 541.)

The plaintiff saw Dr. Lewis again on November 5, 1997. She reported that she had not had any problem with depression but that she had been having anxiety attacks.  She reported stress from her job.  She also reported that her blood pressure had increased. Dr. Lewis noted that Ativan[5] seemed to help plaintiff relax.  He

---

[3]Prozac is indicated for the treatment of depression. Physicians' Desk Reference 1128 (55th ed. 2001).

[4]Paxil is indicated for the treatment of depression. Physicians' Desk Reference 3115 (55th ed. 2001).

[5]Ativan is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety or anxiety

reported her mental status as within normal limits and continued to diagnose her with major depression and possible alcohol abuse. He prescribed Prozac and Ativan. (Tr-II 540.)

On February 17, 1998, plaintiff was admitted to Barnes-Jewish Hospital for anxiety and panic attacks, under the care of Dr. Lewis. (Tr-II 508.) She was discharged on February 19, 1998. (Tr-II 506.) At discharge, Dr. Lewis reported that plaintiff had not had any suicidal ideation or difficulty with depression, nor did she have any panic attacks while hospitalized. (Tr-II 507.) Dr. Lewis noted that the plaintiff had been having interpersonal problems at work. (Tr-II 506.) A blood work-up showed the plaintiff's potassium level to be low. She was discharged to return home and was instructed to follow up with Dr. Lewis. She was prescribed Buspar[6] and potassium. Dr. Lewis noted that upon discharge, plaintiff's condition had improved. (Tr-II 507.)

Plaintiff saw Dr. Lewis on March 11, 1998, who noted that plaintiff was on leave from her teaching job for disability. Dr. Lewis summarized the difficulties plaintiff has had with her principal, including his inappropriate remarks and invitations, his suspected thefts from fund raisers, his retaliatory acts, and his

---

associated with depressive symptoms. Physicians' Desk Reference 3348 (55th ed. 2001).

[6]Buspar is used to treat anxiety disorders or for the short term relief of the symptoms of anxiety. Medline Plus (last revised Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a688005.html>.

report of child abuse by plaintiff. Plaintiff reported that she could not work in that environment because of the anxiety and tension caused thereby. Plaintiff reported that since she began experiencing work-related stress, she has experienced a decreased mood, panic attacks, sweats, rapid heart rate, decreased sleep, decreased appetite, decreased energy, decreased interest, and some difficulty with her memory. She denied suicidal ideation. Dr. Lewis reported that plaintiff's mental status was within normal limits and he continued to diagnose her with major depression and possible alcohol abuse. (Tr-II 538.) He prescribed Prozac and Buspar. (Tr-II 539.)

The plaintiff returned to Dr. Lewis on April 8, 1998, and reported that she had been experiencing a lot of anxiety and stress. Plaintiff reported that her disability status resulted in a loss of income causing problems with bill collectors and her possessions being repossessed. She reported decreased sleep, increased appetite and low energy, but decreased panic attacks. Plaintiff reported that she had been going to a pain clinic where she had been prescribed Darvocet, Vicodin and Percodan. Plaintiff reported that she was planning to move to Seattle, Washington, in June of that year. Dr. Lewis noted that plaintiff was "very talkative, somewhat circumstantial." He continued to diagnose plaintiff with major depression and possible alcohol abuse. He

prescribed Buspar, Trazodone[7] and Prozac.  (Tr-II 537.)

Plaintiff saw Dr. Lewis again on May 6, 1998.  She reported that she had been hospitalized for hypertension since her last appointment.  She reported continued difficulty with money as a result of her disability status.  She reported that she would resign from her job later that month and was planning to move to Portland, Oregon, in August.  Dr. Lewis noted that the plaintiff was very pleasant and very talkative.  He continued to diagnose her with major depression and possible alcohol abuse.  He prescribed Buspar, Trazodone and Prozac.  (Tr-II 536.)

Plaintiff returned to Dr. Lewis on June 3, 1998.  She reported that she was still having difficulty sleeping.  She reported that she is earning money by "running trips to casinos." She reported that she still planned to move to Oregon.  Dr. Lewis noted that the plaintiff's mood was euthymic[8] and he continued to diagnose her with major depression and possible alcohol abuse.  He increased her dosage of Trazodone and also prescribed Buspar and Prozac.  (Tr-II 535.)

Plaintiff saw Dr. Lewis again on July 8, 1998.  She reported that she had been under a lot of stress in the last month

---

[7]Trazodone is used to treat depression.  Medline Plus (last revised Apr. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html>.

[8]"[C]haracterized by joyfulness, mental peace and tranquility; not manic or depressed."  Stedman's Medical Dictionary 606 (26th ed. 1995).

because three of her friends had died. She reported increased anxiety and panic. She reported a depressed mood, irritability, increased sleep and appetite, decreased energy, and an "I don't care" attitude. Plaintiff reported that she planned to move to Oregon in October. Dr. Lewis noted that plaintiff's mood was euthymic and that she was cheerful and friendly despite her depressive symptoms. He continued to diagnose plaintiff with major depression and possible alcohol abuse. He prescribed Buspar, Trazodone and Prozac. (Tr-II 534.)

Plaintiff returned to Dr. Lewis on September 9, 1998. She reported increased depression, decreased sleep and insomnia, more irritability, low energy, low interest level, and a fluctuating appetite. She reported feeling that her mind races, that she talks too fast, and that her movements had become rapid. She also reported that there was a time when she gambled and drank excessively. Dr. Lewis posited that the plaintiff may have bipolar type II affective disorder. He reported that the plaintiff's mood was euthymic and that she was friendly and cheerful despite her depressive symptoms. He prescribed Buspar, Trazodone, Prozac, and Mellaril.[9] (Tr-II 533.)

Plaintiff returned to Dr. Lewis on October 28, 1998, and reported that she was "doing better" and had been able to earn some

_____

[9]Mellaril (thioridazine) is used to treat schizophrenia and symptoms such as hallucinations, delusions and hostility. Medline Plus (last revised Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682119.html>.

extra money. She reported that 100 milligrams of Mellaril was excessive and that she had been breaking it into 25 milligram portions. Dr. Lewis noted plaintiff's mood to be euthymic. He continued to diagnose plaintiff with possible bipolar type II affective disorder and possible alcohol abuse. He prescribed Buspar, Trazodone, Prozac, and 25-100 milligrams of Mellaril. (Tr-II 532.)

The plaintiff was admitted, under the care of Susan Colbert-Threats, into Barnes-Jewish Hospital on November 24, 1998, with diagnoses of atypical chest pain, hypertension, and diarrhea. (Tr-II 504.) While hospitalized, plaintiff underwent cardiac catheterization which revealed no significant coronary artery disease. However, plaintiff did have left ventricular hypertrophy and left ventricular enlargement and small vessel angina. Dr. Threats recommended that plaintiff be treated for control of high blood pressure which should include a calcium channel blocker. Plaintiff was discharged on November 27, 1998, with the following medications: Norvasc,[10] Buspar, Premarin,[11] Pepcid,[12] Prozac,

---

[10]Norvasc is indicated for the treatment of hypertension and chronic stable angina. Physicians' Desk Reference 2506 (55th ed. 2001).

[11]Premarin is a conjugated estrogen tablet. Physicians' Desk Reference 3429 (55th ed. 2001).

[12]Pepcid is indicated for the short term treatment of gastroesophageal reflux disease (GERD). Physicians' Desk Reference 1989 (55th ed. 2001).

Maxzide,[13] Avapro,[14] Toprol XL,[15] K-Lor,[16] Mellaril, and Trazodone. (Tr-II 505.)

Plaintiff saw Dr. Lewis on April 7, 1999. He noted that the plaintiff had undergone gastric bypass surgery and had lost seventy-five pounds. Plaintiff reported that she was no longer taking blood pressure medications and had stopped taking Buspar, Prozac and Mellaril. She reported that she did not feel depressed. She reported some difficulties in family relationships. Dr. Lewis recorded plaintiff's mental status to be within normal limits and continued to diagnose plaintiff with possible bipolar type II affective disorder and possible alcohol abuse. He prescribed Trazodone. (Tr-II 531.)

On April 23, 1999, plaintiff saw Dr. Marc Bernstein on referral from Dr. Threats for evaluation and treatment of acute hepatitis B infection. (Tr-II 656.) Plaintiff reported to Dr. Bernstein that following gastric bypass surgery in 1998, she had developed abdominal pain, extreme fatigue and diarrhea. She reported that she had been hospitalized the previous month for

---

[13]Maxzide is indicated for the treatment of hypertension or edema. Physicians' Desk Reference 944 (55th ed. 2001).

[14]Avapro is indicated for the treatment of hypertension. Physicians' Desk Reference 996 (55th ed. 2001).

[15]Toprol XL is indicated for the treatment of hypertension and angina pectoris. Physicians' Desk Reference 606 (55th ed. 2001).

[16]K-Lor is an electrolyte replenisher. Physicians' Desk Reference 464 (55th ed. 2001).

complications from the 1998 surgery. Dr. Bernstein noted plaintiff's diagnosis in 1982 of acute hepatitis A and B. Upon examination, Dr. Bernstein found plaintiff to be morbidly obese but in no other acute distress. He noted that she was very angry. The physical exam was unremarkable. Dr. Bernstein determined that "the etiology of her current liver-associated enzymes is not clear; however, it is not secondary to acute hepatitis B." (Tr-II 657.) He opined that the elevated liver enzymes may be secondary to her gastric bypass surgery. He recommended that plaintiff undergo a right upper quadrant ultrasound to rule out hepatocellular carcinoma, and other tests to rule out autoimmune or inherited hepatitis. He also recommended that the plaintiff return to Dr. Threats, her primary care physician, concerning her high blood pressure medication. (Tr-II 658.)

Plaintiff underwent an abdominal sonogram on May 6, 1999, at Malinckrodt Institute of Radiology. The liver demonstrated normal echogenicity and size, as did the veins of the liver with normal direction of flow. The testing physician concluded, "an unremarkable liver ultrasound without evidence of a focal lesion." (Tr-II 655.)

Plaintiff returned to Dr. Lewis on June 9, 1999. He reported that plaintiff was doing relatively well emotionally, but that she had experienced some stress over her daughter's behavior. Plaintiff reported that she was planning to move to Seattle on July 2, 1999. She reported that she was having difficulty sleeping and

had been taking Mellaril to fall asleep. Dr. Lewis regarded plaintiff's mental status to be within normal limits and continued to diagnose her with possible bipolar type II affective disorder and possible alcohol abuse. He discontinued plaintiff's prescription of Trazodone and prescribed Mellaril. (Tr-II 530.)

On July 9, 1999, plaintiff underwent endoscopy at Barnes-Jewish Hospital because of severe abdominal pain after gastric bypass surgery. (Tr-II 487-502, 653-54.) The procedure, performed by Dr. Bernstein, revealed no evidence of significant pathology in the entire esophagus. The test indicated a normal esophagus, prior gastric bypass and a normal intestine. Upon discharge, plaintiff was ordered to continue on her present medications. (Tr-II 497.)

Plaintiff saw Dr. Lewis again on July 14, 1999. She reported that she had been under stress because her move to Seattle had been delayed. Dr. Lewis recorded the plaintiff's mental status as within normal limits and continued to diagnose her with possible bipolar type II affective disorder and possible alcohol abuse. He prescribed Mellaril. (Tr-II 529.)

Plaintiff returned to Dr. Lewis on October 20, 1999. She reported that she moved to Seattle since her last appointment, but had returned to St. Louis because she was being sexually harassed by a neighbor. She reported some depressive symptoms: decreased appetite, decreased interest, insomnia, and decreased concentration. Dr. Lewis noted that plaintiff's mental status appeared to be within normal limits and he continued to diagnose

her with possible bipolar type II affective disorder and possible alcohol abuse. (Tr-II 527.) He discontinued plaintiff's prescription for Mellaril and prescribed Remeron for sleep.[17] A note in the chart indicates that plaintiff called Dr. Lewis on October 25, 1999, and reported that Remeron did not help her sleep. Dr. Lewis prescribed Mellaril instead. (Tr-II 526.)

Plaintiff saw Dr. Lewis again on November 17, 1999. She reported insomnia that is not relieved by Mellaril, Remeron or Trazodone. She reported that she did not sleep for two or three days. She complained of irritability, some nervousness and difficulty concentrating, but denied racing thoughts. Dr. Lewis posited that the plaintiff was somewhat hypomanic and increased her dosage of Mellaril. He continued to diagnose plaintiff with possible bipolar type II affective disorder and possible alcohol abuse. (Tr-II 525.)

Plaintiff returned to Dr. Lewis on November 24, 1999, and reported that the increased dosage of Mellaril was helping her sleep at night. She reported that she was feeling less irritable, more energetic and somewhat calmer. Plaintiff reported that she normally sleeps three to four hours per night and sometimes will go for two or three days without sleeping. She reported times when her mind raced, sounds seemed louder, she could hear her thoughts, her heart beat louder, and her movements were speeded up. She

---

[17]Remeron is indicated for the treatment of depression. Physicians' Desk Reference 2290 (55th ed. 2001).

reported that this happened most frequently when she was younger. She also reported that she talked faster and others would ask her to slow down. She reported that in the past she had gone on gambling binges, had bought things excessively and was very sexually active. She reported that at one time she worked as a school teacher during the day and at a casino at night. She reported that during that time she slept only two or three hours at night. Dr. Lewis opined that plaintiff had "very mild" bipolar II affective disorder. He continued her prescription of Mellaril. (Tr-II 523.)

Plaintiff saw Dr. Lewis again on December 29, 1999. She reported that she was sleeping well on the Mellaril. She reported some loss of interest, loss of confidence and difficulty being around people. She denied mind racing and reported that her concentration and appetite were good. Dr. Lewis noted that plaintiff seemed somewhat subdued. He continued to diagnose plaintiff with bipolar type II affective disorder and possible alcohol abuse. He continued her prescription of Mellaril and added Wellbutrin.[18] (Tr-II 522.)

Plaintiff returned to Dr. Lewis on January 19, 2000. She reported that she felt somewhat better, had more confidence and was better able to make decisions. She reported that she had experienced no side effects from the medications. She reported

_____

[18]Wellbutrin is indicated for the treatment of depression. <u>Physicians' Desk Reference</u> 1486 (55th ed. 2001).

that she was sleeping well. She reported that her interest and energy levels were still somewhat low. Dr. Lewis noted that plaintiff was less talkative and more subdued. He continued to diagnose plaintiff with bipolar type II affective disorder. He continued her prescriptions of Mellaril and Wellbutrin. (Tr-II 520.)

Plaintiff saw Dr. Lewis again on February 16, 2000, and reported experiencing dizziness with the medication. Dr. Lewis posited that Mellaril "might be a problem." Plaintiff reported that her mood was improving but she still had decreased interest and lowered self-confidence. Dr. Lewis regarded plaintiff's mood to be within normal limits and continued the diagnoses of bipolar type II affective disorder and possible alcohol abuse. He discontinued Mellaril and prescribed Seroquel,[19] and continued Wellbutrin. (Tr-II 519.)

A letter from Dr. Reina Villareal to Dr. Threats indicates that plaintiff saw Dr. Villareal on referral from Dr. Threats on February 22, 2000, for evaluation of bone disease. (Tr-II 665-66.) Bone density studies showed osteopenia[20] in the spine

---

[19]Seroquel is indicated for the management of the manifestations of psychotic disorders. <u>Physicians' Desk Reference</u> 640 (55th ed. 2001).

[20]"Decreased calcification or density of bone[.]" <u>Stedman's Medical Dictionary</u> 1270 (26th ed. 1995).

and a normal density in the left femur.[21]  Dr. Villareal indicated that plaintiff had osteopenia secondary to several risk factors which included a history of hysterectomy without hormone replacement therapy for one year, history of gastric bypass surgery (although she denied any symptoms consistent with malabsorption), history of thyroid hormone intake, and a history of smoking.  Dr. Villareal recommended that plaintiff continue on hormone replacement therapy, increase her calcium supplementation to 1200 milligrams per day, and begin taking a multi-vitamin every day. Dr. Villareal recommended that plaintiff return in one year for follow up bone density testing.  (Tr-II 666.)

Plaintiff saw a physician at the Washington University Neurology Clinic on April 3, 2000.  She complained of having experienced dizziness during the past few months, but indicated that it had somewhat improved.  Plaintiff also indicated that she experiences dizziness upon standing.  The physician diagnosed orthostatic lightheadedness and noted plaintiff's history of marked orthostatic hypotension.  The physician noted that the symptoms had improved and recommended that plaintiff return in four to six weeks.  (Tr-II 569-70.)

On April 12, 2000, Dr. Lewis made a note that plaintiff had called the previous week to report that she had decreased her dosage of Wellbutrin and had become more depressed.  Dr. Lewis

---

[21]Laboratory reports of these studies appear in the transcript at Tr-II 667-93.

increased plaintiff's dosage and recommended that she continue on the Seroquel. (Tr-II 518.)

On April 28, 2000, Dr. Lewis received a call from Dr. Threats stating that the plaintiff was depressed and had not been able to eat for three weeks. Dr. Threats reported that plaintiff had recently experienced two deaths in the family and was under a lot of stress, had difficulty sleeping, decreased concentration, decreased energy, and loss of appetite. Dr. Threats also reported that plaintiff's mother might have cancer. Dr. Threats reported that plaintiff had lost eleven pounds. Dr. Lewis recommended that plaintiff's dosage of Wellbutrin be increased and he prescribed Ambien for sleep.[22] (Tr-II 517.)

Plaintiff saw another physician at the Washington University Neurology Clinic. She indicated that her blood pressure medication had been changed.[23] (Tr-II 567.)

Plaintiff was seen in the emergency room of Barnes-Jewish Hospital on May 9, 2000. (Tr-II 560.) She complained of dysuria but denied abdominal or flank pain.[24] (Tr-II 564.) She was prescribed Cipro and encouraged to follow up with her primary care

---

[22]Ambien is indicated for the short-term treatment of insomnia. Physicians' Desk Reference 2974 (55th ed. 2001).

[23]Much of this record is illegible.

[24]Dysuria is difficulty or pain in urination. Stedman's Medical Dictionary 537 (26th ed. 1995).

physician.[25]  (Tr-II 566.)

On May 30, 2000, plaintiff was seen by Dr. Raymond Leung at West Park Medical Clinic for an evaluation at the request of Disability Determinations.  Dr. Leung noted plaintiff's chief complaints to be hypertension and musculoskeletal pain.  The plaintiff reported a history of having hypertension for eighteen years.  She reported that she had taken various medications and that she had twice been hospitalized for the condition.  Plaintiff also reported that she experienced pain in her left hip and with burning to her upper anterior legs.  She stated that her hip was first injured in 1980 in a motor vehicle accident.  She reported that she fell and injured her hip again in 1997.  She described the pain as sharp with an intensity of five on a scale of one to ten.  She did not report any numbness, weakness or tingling in her left leg.  Plaintiff reported that the pain increased with movement and decreased with rest and heat.  She indicated that she takes Celebrex for pain relief.[26]  (Tr-II 544.)  Plaintiff also reported burning and pain to her anterior thighs bilaterally which she experienced every day, with an intensity of six to seven on a scale of one to ten.  Plaintiff reported that bending made her dizzy, but she denied difficulty with squatting, sitting or standing.  She

_____

[25]Cipro is indicated for the treatment of infections. Physicians' Desk Reference 848 (55th ed. 2001).

[26]Celebrex is indicated for signs and symptoms of osteoarthritis and rheumatoid arthritis.  Physicians' Desk Reference 2986 (55th ed. 2001).

reported that she can walk one half of a mile, can climb one or two flights of stairs, and can lift twenty-five to thirty pounds. Plaintiff reported her current medications to be calcium, Centrum, vitamin D, Flonase,[27] Meclizine,[28] Ambien, Prozac, Celebrex, Premarin, Toporol, Triam,[29] and Norvasc. (Tr-II 545.) Upon physical examination, Dr. Leung made the following findings: Plaintiff appeared her stated age. She had no rashes or other abnormal skin lesions. Lymph nodes, eyes, ears, nose, mouth, and neck were all within normal limits. She had a regular heart rate and rhythm without murmurs, gallops or rubs. Her lungs were clear to auscultation and percussion without wheezing. Plaintiff's abdomen showed no abnormal distension or asymmetry. Her bowel sounds were active. There was no evidence of bruits, masses, visceromegaly, tenderness, rebound, or guarding. Dr. Leung noted abdominal surgical scars. Plaintiff was able to heel walk, toe walk and squat. She displayed lumbar forward flexion to ninety degrees without vertebral tenderness or paralumbar spasm. There was mild to moderate tenderness over the anterior and lateral

---

[27]Flonase is a nasal spray indicated for the management of the nasal symptoms of seasonal and perennial allergic and nonallergic rhinitis. Physicians' Desk Reference 1389 (55th ed. 2001).

[28]Meclizine (Antivert) is indicated for the management of nausea and vomiting, and dizziness associated with motion sickness. Physicians' Desk Reference 2469 (55th ed. 2001).

[29]Triam is a corticosteroid used to provide relief to inflamed areas of the body. Medline Plus (revised Mar. 25, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202018.html>.

thighs bilaterally. There was mild tenderness to palpitation over the left hip. Her gait was normal and she had no difficulty getting on and off the examination table. Plaintiff exhibited good grip strength, fine finger movements, and finger-thumb opposition bilaterally without evidence of intrinsic muscle atrophy. A neurologic exam was normal as was examination of the extremities. (Tr-II 546.) Dr. Leung noted plaintiff's history of hypertension but noted that her blood pressure was currently normal at 120/80. Dr. Leung noted that the physical examination was significant for tenderness in the left lateral hip and anterior and lateral thighs bilaterally, but revealed no evidence of swelling or warmth. Plaintiff had full range of motion in the left hip, a gait within normal limits, and normal leg strength. (Tr-II 547.) Dr. Leung found plaintiff to have full range of motion in the shoulder, elbow, wrist, knee, hip, cervical spine, and lumbar spine. (Tr-II 548-49.) Dr. Leung found plaintiff's grip strength on both the left and the right to be at a five on a scale of one to five. He found that plaintiff's upper extremity strength on both left and right was five on a scale of one to five, with good effort. (Tr-II 548.) Dr. Leung also found that plaintiff's level of lower extremity muscle weakness was five on a scale of one to five, with good effort. (Tr-II 549.)

Dr. John P. Crotty x-rayed plaintiff's lumbar spine on May 30, 2000, at the request of Dr. Leung. The x-ray revealed small spurs at L-3 and L-4 and mild interspace narrowing at the L-

5/S-1 level.  There was no fracture or dislocation, but there were degenerative changes in the left sacroiliac joint.  Dr. Crotty recorded his impression as minimal osteodegenerative change of the lumbar spine with mild interspace narrowing at the L-5/S-1 level.  He also noted localized degenerative changes in the left sacroiliac joint.  (Tr-II 550.)

On May 30, 2000, plaintiff saw Dr. Harry J. Deppe for a psychological evaluation, at the request of Disability Determinations.  Dr. Deppe summarized plaintiff's social history, family relationships and education.  He noted that the plaintiff was currently unemployed and last worked in 1998.  Dr. Deppe noted that plaintiff had been hospitalized once for depression.  It was noted that plaintiff currently took Prozac and Ambien.  Plaintiff told Dr. Deppe that she had experienced sleep problems for years and described periods during which she stayed up for days at a time.  Dr. Deppe also noted plaintiff's hypertension, osteoporosis and past gastric bypass surgery.  (Tr-II 551-52.)  Dr. Deppe performed a mental status examination and reported plaintiff to be a forty-six year old female of medium height and medium build.  Dr. Deppe reported plaintiff's mood to be somewhat anxious but that her affect was within normal limits.  Plaintiff exhibited no unusual thought disturbances.  She was oriented to time, place and person. Her memory for more remote events was stronger than her recall for more recent ones.  She was able to recall her mother's maiden name, her own social security number and the birth dates of her children.

Plaintiff was able to recall her activities for the past three days, but with some difficulty. She denied past or current suicidal or homicidal ideations. (Tr-II 552.) Dr. Deppe recorded his impression that plaintiff was experiencing symptoms associated with a major affective disorder and specifically, bipolar disorder-mixed. (Tr-II 553.) Dr. Deppe made the following diagnoses:

        Axis I:        Bipolar disorder, mixed;
        Axis II:       Deferred;
        Axis III:      Hypertension
                       Gastric bypass surgery, 1998
                       Osteoporosis;
        Axis V:        GAF = 60.[30]

(Tr-II 553.)

In a letter dated July 12, 2000, Dr. Villareal reported to Dr. Threats of plaintiff's visit that same date to the Bone Health Clinic at Washington University School of Medicine. (Tr-II 663-64.) It was noted that plaintiff had reported that she discontinued hormone replacement therapy four months prior to the visit because it elevated her blood pressure. She complained of hip and shoulder joint pain and burning pain in her thighs, legs and feet. Bone density studies showed an 8.8% increase in bone

_____

[30]A GAF (Global Assessment of Functioning) score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

density of the lumbar spine and a 2% increase in the bone density of the left femur. The density value on the spine was noted to be consistent with osteopenia and the value on the femur was considered to be normal.[31] (Tr-II 663.) Dr. Villareal recommended that plaintiff continue with calcium supplementation and doses of vitamin D and recommended that she return for re-evaluation in one year. (Tr-II 664.)

The record indicates that plaintiff was admitted to Barnes-Jewish Hospital on July 20, 2000, because of experiencing fainting spells and blackouts during the previous two months. (Tr-II 605.) While in the hospital, plaintiff underwent video/EEG monitoring to detect the origins of her blackouts. (Tr-II 596.) The record indicates that during the two days of recording, plaintiff experienced three episodes that were captured on tape and were recorded on an EEG. The interpreting physicians found that the episodes were not epileptic in nature. (Tr-II 597.) Dr. Vladimir V. Karpitskiy dictated a discharge summary that indicated that a physical exam of plaintiff was unremarkable and that blood tests, EEG, carotid doppler testing, a head CT scan, and a chest x-ray were all normal. The EEG testing revealed no abnormal electrical brain activity. The plaintiff was discharged on July 24, 2000. (Tr-II 595.)

Plaintiff was admitted to Barnes-Jewish Hospital on

---

[31]Laboratory reports of these studies appear in the transcript at Tr-II 667-93.

August 2, 2000, for depression and alcoholism.   (Tr-II 584.)

Psychiatric intake assessments were done by Dr. Luis Giuffra (Tr-II

585-87) and Dr. John R. Pruett (Tr-II 588-90).   Dr. Giuffra made

the following diagnoses:

|          |                                      |
|----------|--------------------------------------|
| Axis I:  | Alcohol dependence,                  |
|          | Depression, not otherwise specified; |
| Axis II: | Deferred;                            |
| Axis III:| See medical history;                 |
| Axis IV: | Unemployed,                          |
|          | Financial Problems,                  |
|          | Mother is ill;                       |
| Axis V:  | GAF 40.[32]                          |

(Tr-II 585.)

Dr. Giuffra recorded plaintiff's chief complaint to be "I've been

drinking too much." (Tr-II 585.)  Dr. Giuffra reported that in

addition to the plaintiff's twenty-year history of depression, she

had recently increased her use of alcohol to the point of

qualifying for alcohol dependence.  He reported that plaintiff was

now drinking up to a fifth of vodka a day.  He reported that

plaintiff's depression and suicidality had worsened.  It was noted

that plaintiff's psychiatrist sent plaintiff for inpatient

treatment after plaintiff's friend contacted him.  Dr. Giuffra

_____

[32]A GAF score of 31-40 indicates some impairment in reality
testing or communication (e.g., speech is at times illogical,
obscure, or irrelevant) or major impairment in several areas, such
as work or school, family relations, judgment, thinking, or mood
(e.g., depressed man avoids friends, neglects family, and is unable
to work; child frequently beats up younger children, is defiant at
home, and is failing at school). Diagnostic and Statistical Manual
of Mental Disorders, Text Revision 34 (4th ed. 2000).

reported that plaintiff was worried about recent unexplained blackouts and admitted experiencing blackouts from heavy drinking as well. (Tr-II 585.) Plaintiff's current medications were noted to be Norvasc, Zestril,[33] Prozac, Celebrex, Premarin, and multivitamins. (Tr-II 586.) Dr. Giuffra recorded his impression as follows:

> The patient will be admitted for safety. She has been disclosing suicidal statements to her friends as well as to her outpatient psychiatrist. These are all in the context of heavy alcohol use. It is unclear to me what extent this alcoholism is responsible for her symptoms of depression and for her unexplained blackouts. At this point it is safest to first detox her before any changes on her medications. I will put her on a p.r.n. schedule of librium, give her thiamine IM for three days, as well as folate and MVI. Admission laboratory tests will be drawn. We will attend to her medical needs as they arise. I will not change her antidepressant's [sic] until she can be reassessed off alcohol.

(Tr-II 587.)

Dr. Pruett made the following diagnoses of the plaintiff:

Axis I:          Depressive disorder not other-
                 wise specified,
                 Somatization disorder;[34]

_____

[33]Zestril is indicated for the treatment of hypertension. Physicians' Desk Reference 656 (55th ed. 2001).

[34]Somatization disorder is characterized by a pattern of recurring, multiple, clinically significant somatic complaints that extend over a period of years and involve a combination of pain, gastrointestinal, sexual, and pseudoneurological symptoms. Diagnostic and Statistical Manual of Mental Disorders, Text

```
Axis II:          No assignment;
Axis III:         Drop attacks,
                  Hypertension,
                  Peptic ulcer disease,
                  Status-post gastric bypass,
                  Cholecystectomy,
                  Hysterectomy,
                  Appendectomy,
                  Hepatitis A & B;
Axis IV:          Chronic medical and psychiatric
                  problems
Axis V:           GAF 35.
```

(Tr-II 588.)

Dr. Pruett recorded the plaintiff's chief complaints as depression and blackouts.  Dr. Pruett summarized plaintiff's history of depression and multiple physical illnesses.  He noted plaintiff's increased drinking in the past months.  Plaintiff described to him many falls as a result of loss of consciousness or "blackouts." Dr. Pruett noted that the plaintiff's "content of thought was positive for suicidal ideation, however, she had a rather upbeat appearance as she was telling me about this."  Plaintiff described her mood as depressed, but Dr. Pruett noted that her affect was inconsistent with her mood.  He found plaintiff's judgment and insight to be questionable.[35]  (Tr-II 588-90.)

On August 7, 2000, plaintiff underwent a colonoscopy at the BJC Health System Digestive Disease Clinical Center which revealed multiple diverticula in the descending colon.  The

---

Revision 485-86 (4th ed. 2000).

[35]No record of the plaintiff's discharge from this hospitalization appears in the transcript.

physician overseeing the testing, Dr. Sreenivasa S. Jonnalagadda, recommended that plaintiff also undergo an upper GI endoscopy. (Tr-II 616.)

Plaintiff was admitted to Barnes-Jewish Hospital on August 13, 2000, because of an overdose. Plaintiff's history of depressive symptomology and significant alcohol abuse was noted. It was noted that plaintiff took a combination of Benadryl, Ambien, Xanax,[36] and vodka. It was reported that plaintiff was not sure whether she was suicidal and that she had said in a manipulative manner, "Well I know if I take an overdose of Norvasc I can die." Plaintiff's mood was described as "bad." A physical exam was unremarkable. Plaintiff was described as a forty-seven year old female with a history of prior psychological admissions. Plaintiff was further described as "very manipulative" and "threatening." (Tr-II 577-81.) Plaintiff was diagnosed as follows:

```
Axis I:    History of Alcohol Abuse
           History of Depression
           Somatization Disorder (see DSM-IV)
Axis II:   Personality Disorder Cluster B (see
           DSM-IV)
Axis III:  Hypertension
           Gastric Bypass Surgery
           Hysterectomy
           Appendectomy
           Hepatitis A & B.
```

(Tr-II 581.)

_____

[36]Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety. Physicians' Desk Reference 2650 (55th ed. 2001).

On August 14, 2000, an attending psychiatrist noted that plaintiff had been transferred from medical services because "she implied she might be suicidal." (Tr-II 582.) It was noted that plaintiff had a long history of intermittent depressive symptoms usually triggered by stress. Plaintiff's intermittent abuse of alcohol was also noted. It was also noted that plaintiff was treated by Dr. Lewis and that she had recently been hospitalized under his care. (Tr-II 583.) The following diagnoses were made:

        Axis I:    Depression, not otherwise specified
                   Alcohol Abuse
        Axis II:   Personality disorder, not otherwise
                   specified
        Axis III:  Abuse of alcohol and prescription
                   medications
                   Hypertension
                   Hepatitis A & B
                   Gastric Bypass Surgery.

(Tr-II 583.)

The psychiatrist noted that s/he discussed with plaintiff the belief that alcohol played a role in her problems and recommended that plaintiff find a means to help her abstain. It was recommended that plaintiff follow up with Dr. Lewis. (Tr-II 583.)

        Substance Abuse Counselor Delphia Whi completed a DSM-IV analysis on August 18, 2000, wherein she made the following findings:

        Axis I:    Depressive disorder, not otherwise
                   specified,
                   Bipolar I disorder, most recent
                   manic episode, moderate;

```
Axis II:    No diagnosis;
Axis III:   Hypotension;
Axis IV:    Social    Environment   -  3 recent
            blackouts,
            Occupational - unable to work due to
            her many illnesses,
            Economic  -  have  applied  for  SS
            disability, so far not approved;
Axis V:     GAF 49.[37]
```

(Tr-II 554.)

The transcript contains an undated "C-Star Counselor Progress Note" in which a counselor noted that plaintiff had two prior psychiatric hospital admissions:  the first in 1998 for depression, and the second in August 2000 for an accidental drug overdose.   The counselor noted that the second admission was perceived as a suicide attempt.  The counselor noted that plaintiff had been seeing a psychiatrist weekly since 1998.   Plaintiff reported to the counselor that she was diagnosed bipolar at age eighteen.  Plaintiff also reported that she had suffered repeated bouts of severe depression.  The counselor noted that there was no indication of a thought disorder.   The counselor estimated plaintiff to be of above average intelligence with no cognitive deficiencies.  Plaintiff denied any homicidal ideation or violent behavior.  Plaintiff reported a history of blackouts, but denied

---

[37]A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

any history of seizures.  Plaintiff reported some historical signs and symptoms of a possible neurological disorder.  (Tr-II 555.) The counselor noted that plaintiff had been under great stress from the deaths of three friends and her bipolar mood disorder.  The counselor also noted that plaintiff's admission to the substance abuse treatment program was mandated by her treating physicians after the accidental overdose of the medications prescribed for her insomnia.  (Tr-II 556.)  The plaintiff readily admitted her abuse of alcohol and of binge drinking. (Tr-II 557.)  The counselor made the following diagnoses of the plaintiff:

```
Axis I:    Bipolar Mood Disorder - Depression,
           Alcohol Abuse - rule out dependence;
Axis II:   Borderline personality features;
Axis III:  Hypertension;
Axis IV:   History of childhood sexual abuse,
           Dysfunctional family of origin;
Axis V:    Current GAF 48.
```

(Tr-II 559.)

On October 25, 2000, Dr. Lewis completed a Mental Medical Source Statement regarding plaintiff.  (Tr-II 571-575.)  With respect to Daily Living, Dr. Lewis indicated that plaintiff had a marked limitation in her ability to cope with stress and a moderate limitation in her ability to behave in an emotionally stable manner.  Dr. Lewis indicated that plaintiff had no limitation in her ability to meet personal needs, her ability to function independently, her ability to maintain her personal appearance, or in her reliability.  (Tr-II 571-72.)  With respect to Social

Functioning, Dr. Lewis indicated that plaintiff had a slight impairment in her ability to relate in social situations and in her ability to interact with the general public. Dr. Lewis reported that plaintiff had no impairment in her ability to accept instructions and to respond to criticism or in her ability to maintain socially acceptable behavior. (Tr-II 572.) In analyzing plaintiff's Concentration, Understanding and Memory, Dr. Lewis indicated that plaintiff was constantly limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Lewis reported that plaintiff was often limited in her ability to understand and remember detailed instructions, in her ability to understand and carry out complex instructions, and in her ability to respond to changes in a work setting. He indicated that plaintiff was seldom limited in her ability to remember procedures. Dr. Lewis reported that plaintiff was never limited in her ability to understand and remember simple instructions, in her ability to maintain regular attendance and be punctual, in her ability to sustain an ordinary routine without special supervision, in her ability to work in coordination with others, or in her ability to make simple work-related decisions. (Tr-II 572-73.) He reported that the plaintiff continually suffered from episodes of deterioration or decompensation in work or work-like settings that would cause her to withdraw from the situation or to experience

49

exacerbation of symptoms. (Tr-II 573.) Dr. Lewis expressed his opinion that plaintiff did not have a substantial loss of her ability to understand, remember, and carry out simple instructions; nor did she have a substantial loss of ability to make judgments that are commensurate with the functions of unskilled work. However, Dr. Lewis did indicate his belief that plaintiff had a substantial loss of ability to respond appropriately to supervision, co-workers and usual work situations and a substantial loss in her ability to deal with changes in a routine work setting. Dr. Lewis opined that plaintiff's limitations had lasted or could be expected to last twelve continuous months. He reported March 1997 as the date of onset of disability. (Tr-II 574.) Dr. Lewis reported his diagnoses of plaintiff's mental impairments to be bipolar II affective disorder and alcohol dependence. He reported plaintiff's most recent GAF score to be 61 and her highest GAF score in the previous year to have been 70.[38] In addition, Dr. Lewis made the following comments: "Patient has had difficulty with both hypomanic and depressive symptoms and excessive alcohol use. She is currently under stress taking care of an ill mother. Patient has a history of having difficulty with full time

---

[38]A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

employment." (Tr-II 575.)

Plaintiff was admitted to Barnes-Jewish Hospital on November 21, 2000, for chest pain.[39] (Tr-II 592.)

Plaintiff saw Dr. Ellen Li on December 22, 2000. The record indicates that this was a return visit and that the plaintiff had been referred by Dr. J. Christopher Eagon. Plaintiff complained of experiencing recurrent abdominal pain and swelling during the previous three days. She requested pain medication. Dr. Li suggested that plaintiff contact her primary care physician for a prescription. Upon examination, Dr. Li noted an irregular heartbeat, arthritis, back pain, bloating, constipation, hematuria, burning with urination, bruising, pruritis, rashes, fainting, depression, and difficulty sleeping. (Tr-II 643.) Dr. Li opined that plaintiff may have biliary colic with transient biliary obstruction. (Tr-II 645.)

Plaintiff was seen at the Washington University Neurology Clinic on January 8, 2001, for "spells." (Tr-II 753-54.) The examining physician noted that the plaintiff had been seen at the Clinic in April of 2000 for orthostatic dizziness. Plaintiff reported that in the spring and summer of 2000, she had experienced multiple episodes of loss of consciousness, but that the spells had decreased in the past months. It was noted that plaintiff had undergone video EEG which was negative. Plaintiff also complained

_____

[39]No other records of this hospitalization appear in the transcript.

51

of headaches with throbbing pain and nausea.  (Tr-II 753.)  It was determined that plaintiff's records regarding her EEG and hospitalization would be reviewed before anything was prescribed for the headaches.  It was recommended that plaintiff return in two to three weeks.  (Tr-II 754.)

Paintiff saw Dr. Li again on January 8, 2001, for further evaluation and management of abdominal pain.  To rule out a bile duct stone, Dr. Li scheduled a MRCP.  Plaintiff reported that she had another bout of pain and a fever of 102 degrees during the previous weekend.  Plaintiff reported that she went to the emergency room but left after she had waited four hours without being seen.  Plaintiff told Dr. Li that she took some of her mother's Donnatal elixir and that it appeared to relieve her symptoms.[40]  Upon physical exam, Dr. Li noted that the plaintiff's abdomen appeared mildly distended when standing.  (Tr-II 641.)  Dr. Li prescribed Donnatal and Prevacid.  (Tr-II 642.)

On January 15, 2001, plaintiff underwent an MRI of her abdomen.  (Tr-II 637-40.)  The test showed no evidence of intra or extrahepatic biliary stone to account for plaintiff's episodic abdominal pain.  The test showed dilatation of the intrahepatic duct centrally and extrahepatic dilatation with distal tapering to

---

[40]Donnatal has been approved for use as adjunctive therapy in the treatment of irritable bowel syndrome and acute enterocolitis. Donnatal may also be useful as adjunctive therapy in the treatment of duodenal ulcer.  Physicians' Desk Reference 2708 (55th ed. 2001).

a normal caliber. The testing physician reported that this was within normal limits for a patient who is status post cholecystectomy. (Tr-II 640.)

Plaintiff underwent a colonoscopy on January 18, 2001, which revealed a few diverticula in the sigmoid colon and in the descending colon indicating diverticulosis. Otherwise, the test revealed a normal colon. (Tr-II 653.)

Plaintiff returned to Dr. Li on January 26, 2001, to discuss the test results. Dr. Li noted the tests to indicate that medical management of plaintiff's symptoms with antispasmodics was the best course of treatment. Plaintiff reported to Dr. Li that she had been feeling better with only residual discomfort. (Tr-II 631.)

Plaintiff underwent repair of an incisional hernia on February 27, 2001. Dr. Eagon was the surgeon. Dr. Eagon's notes indicate that plaintiff had developed a persistent wound infection after her gastric bypass surgery in 1998. Thereafter, plaintiff developed a bulge in the right upper quadrant, requiring surgical repair.[41] (Tr-II 706.) Plaintiff was discharged on March 1, 2001. A discharge report indicates that plaintiff did well post-operatively and was stable upon discharge. (Tr-II 694.)

Plaintiff returned to Dr. Li on March 9, 2001, complaining of pain and swelling near her incision. Dr. Li recited

―――――――――――――――――――

[41]Additional records of the surgery appear in the transcript at Tr-II 694-732.

plaintiff's relevant history, noting that plaintiff had vacationed to Cancun subsequent to her last appointment with Dr. Li in January 2001, had experienced a recurrent attack of abdominal pain and underwent hernia repair on February 27, 2001. (Tr-II 621.) Dr. Li recommended that the plaintiff visit Dr. Eagon at the surgery clinic for advice on the incision. Dr. Li also recommended that plaintiff undergo more lab work to check past elevated LFT levels. (Tr-II 623.)

A letter from Dr. Villareal to Dr. Threats documents a March 13, 2001, follow up appointment with Dr. Villareal at the Bone Health Clinic at Washington University School of Medicine. (Tr-II 661-62.) Plaintiff complained of vaginal dryness and low libido. Plaintiff also claimed that she had not been faithfully taking her calcium supplementation or vitamin D. Dr. Villareal reported that bone density studies of the back showed a 3.1% decrease in bone density and that studies of the left femur showed a 12.4% decrease.[42] Dr. Villareal found both decreases to be significant, noting specifically that the density of the spine was consistent with osteoporosis and density of the femur consistent with osteopenia, despite plaintiff's hormone replacement therapy. Dr. Villareal noted, however, that the plaintiff "has problems with compliance with her medications." (Tr-II 661.) Dr. Villareal recommended that plaintiff resume taking calcium supplements and

_____

[42]Laboratory reports of these studies appear in the transcript at Tr-II 667-93.

continue on hormone replacement therapy. Pamidronate infusions were prescribed.[43] Dr. Villareal recommended that plaintiff return in six months for repeat bone density testing. (Tr-II 662.)

On March 23, 2001, plaintiff visited Dr. Marc A. Fallah on referral regarding abnormal liver enzymes. Plaintiff told Dr. Fallah that most of her liver abnormalities had occurred since her gastric bypass surgery in 1998. (Tr-II 620.) Plaintiff indicated some localized epigastric abdominal swelling. Upon examination, Dr. Fallah noted a slight fullness in the epigastrium. (Tr-II 619-20.) After reviewing the lab work, Dr. Fallah opined that the plaintiff may have a component of nonalcoholic steatohepatitis or an autoimmune cholangiopathy. A biopsy was recommended. (Tr-II 619.)

Plaintiff underwent a needle biopsy of her liver on April 2, 2001, the results of which indicated focal portal chronic inflammation with fibrosis. In addition, there was bile duct proliferation in the portal tracts as well as evidence of bile duct epithelial damage. (Tr-II 618.)

On May 9, 2001, plaintiff went to Barnes-Jewish Hospital for a foot injury she sustained in a fall at her home. (Tr-II 742.) Plaintiff thereafter saw Dr. Jeffrey E. Johnson at the

---

[43]Pamidronate is used to treat hypercalcemia (too much calcium in the blood) that may occur with some types of cancer, and is also used to treat Paget's disease of bone and to treat bone metastases. Medline Plus (revised Dec. 18, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202662.html>.

Barnes-Jewish Surgery specialty clinic on May 16, 2001, complaining of pain at the injury site. (Tr-II 743.) X-rays of the foot revealed no current dislocation or fracture. (Tr-II 744.)

Plaintiff was admitted to Missouri Baptist Medical Center on May 15, 2002, for repair of right tibial fracture, for which plaintiff had previously undergone surgery which had failed. (Tr-I 705-27.) It was noted that plaintiff lived alone. (Tr-I 721.) It was noted that plaintiff had sustained bilateral tibial fractures as a result of a fall down some stairs at her home in April 2002, underwent surgery, and thereafter participated in physical therapy at St. Louis Rehab Institute for two weeks. It was noted that plaintiff engaged in independent living prior to her fall. (Tr-I 712.) Surgical re-repair of the right tibial fracture was performed on May 15, 2002, with removal of hardware, realignment and bone grafting. (Tr-I 719.) On May 17, 2002, plaintiff requested that she be readmitted to the Rehab Institute for physical therapy and refused to participate in rehabilitation therapy elsewhere. (Tr-I 713.) Plaintiff participated in physical therapy during her admission at Missouri Baptist. (Tr-I 708-11, 716-17.) On May 21, 2002, plaintiff was discharged from Missouri Baptist and was transferred to Town and Country Healthcare Center for skilled physical therapy. (Tr-I 661, 687-95.) Upon transfer, plaintiff's medications were noted to include Norvasc, Prozac,

Premarin, Lithium,[44] multivitamins, Vasotec,[45] Tums, Surmontil,[46] Imuran,[47] and Percocet.[48]  (Tr-I 694.)

Upon plaintiff's admission to Town and Country, her primary diagnosis of right tibial fracture was noted as well as her diagnosed bipolar affective disorder, osteoporosis and hypertension.  (Tr-I 687.)  Plaintiff met with MSW Jacki Meyer on May 22, 2002, who obtained plaintiff's social history.  Plaintiff reported that she had attempted suicide on three occasions between the ages of twenty and twenty-five.  Plaintiff reported to Ms. Meyer that she was currently in her fourth marriage and that her husband was verbally abusive.  Plaintiff reported that she sustained multiple broken bones during a beating by her third husband and that she had undergone many surgeries on account thereof and spent months in a wheelchair at that time.  Plaintiff reported that her mother died of lung cancer two years ago at which

---

[44]Lithium carbonate is indicated in the treatment of manic episodes of manic-depressive illness.  Physicians' Desk Reference 3090 (55th ed. 2001).

[45]Vasotec is indicated for the treatment of hypertension. Physicians' Desk Reference 2046 (55th ed. 2001).

[46]Surmontil is indicated for the relief of symptoms of depression.  Physicians' Desk Reference 3454 (55th ed. 2001).

[47]Imuran is indicated for the management of severe, active rheumatoid arthritis.  Physicians' Desk Reference 1220 (55th ed. 2001).

[48]Percocet is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference 1211 (55th ed. 2001).

time she began drinking alcohol.  Plaintiff reported that she had three children, but that she believed her oldest son was a "9-11" victim inasmuch as she had not spoken with him since September 10, 2001.  Plaintiff reported that she had been seeing a psychiatrist at Barnes Hospital, Dr. Dellanos, for approximately seven months after a two-day inpatient psychiatric admission during which she was diagnosed with bipolar disorder.  Plaintiff reported that she receives support and help from her fellow church members, but that she enjoys being alone reading, doing crafts and staying up late at night.  (Tr-I 682.)

       While admitted at Town and Country, plaintiff participated in therapeutic exercises and gait training, and also participated in a nutritional program for weight loss.  (Tr-I 599, 616, 645-50, 657, 658, 663, 670.)  She continually requested and was given medication for breakthrough pain.  (Tr-I 617, 621, 660-61.)  It was noted that plaintiff had immensely low tolerance for pain.  (Tr-I 660.)  On account of lab results from May 27, 2002, plaintiff was instructed to discontinue Tylenol and was further instructed to undergo a repeat liver panel in two weeks.  (Tr-I 663, 666.)  In a Recreational Assessment completed May 31, 2002, it was noted that plaintiff was at ease interacting with others and doing self-initiated activities with her own goals.  It was noted that plaintiff was not at ease doing structured activities and did not accept invitations to group activities.  (Tr-I 643.)  Persistent mood problems were noted to include insomnia and crying/

tearfulness. (Tr-I 634.)

On June 18, 2002, plaintiff was noted to be pleasant and cheerful. Plaintiff was scheduled for discharge from Town and Country upon evaluation by an orthopaedist. Plaintiff continued to complain of pain and was prescribed Percocet. Plaintiff was also instructed to continue on Lithium for bipolar disorder. Plaintiff's hypertension was noted to be controlled with Norvasc and Enalapril.[49] Plaintiff was instructed to check with her orthopaedist about continued outpatient physical therapy. (Tr-I 596.) Plaintiff was discharged from Town and Country on June 19, 2002. (Tr-I 591.)

Plaintiff visited Dr. Fallah on September 3, 2002, for follow up on her history of abnormal liver enzymes. Dr. Fallah noted plaintiff's liver biopsy of April 2001 after which plaintiff was prescribed medication, including Prednisone which caused intolerable side effects such as significant weight gain and emotional side effects. Dr. Fallah noted plaintiff to currently be rehabilitating from multiple leg fractures and to be taking pain medication. Plaintiff's current medications were noted to include Lithium, Prozac, Imuran, Vicodin,[50] and blood pressure medications. Dr. Fallah noted plaintiff to persistently have abnormal liver

---

[49]Enalapril is indicated for the treatment of hypertension. Physicians' Desk Reference 575-76 (55th ed. 2001).

[50]Vicodin is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1629-30 (55th ed. 2001).

enzymes despite "rather decent doses of Imuran." Dr. Fallah noted plaintiff's weight gain may be contributing to some of her abnormal liver enzymes. (Tr-I 589.) It was determined that plaintiff would undergo an ultrasound to evaluate bile ducts and liver parenchyma, that plaintiff's liver biopsy would be re-reviewed, and that further adjustments would be made to plaintiff's medications if necessary. Plaintiff was encouraged to try to lose weight. (Tr-I 590.)

An abdominal ultrasound performed September 4, 2002, showed status post cholecystectomy with mild dilation of the mid portion of the common bile duct. (Tr-I 588.)

Plaintiff's liver enzymes continued to be at abnormal levels on September 13 and November 22, 2002. (Tr-I 584-87.) On November 22, 2002, plaintiff reported to Dr. Fallah that she had been experiencing ongoing diarrhea for two to three months, that she had undergone several surgeries on her right leg, that she has been gaining weight, and that she experiences right-sided chest wall pain. Dr. Fallah noted plaintiff to have gained five pounds since September. Plaintiff's current medications were noted to be Norvasc, Lithium, Prozac, and Vicodin. Dr. Fallah opined that plaintiff's liver enzyme abnormality may be due to intestinal bacterial overgrowth and determined to prescribe Flagyl to help with this possible condition as well as plaintiff's diarrhea. (Tr-I 582.) Dr. Fallah determined to recheck plaintiff's liver enzymes in one month and to proceed with a liver biopsy if they had not

improved. (Tr-I 583.)

On November 25, 2002, Dr. Fallah noted plaintiff's laboratory results to show much improvement and biopsy was deferred. (Tr-I 583.)

Plaintiff visited Dr. Kurt Merkel on January 14, 2003, and complained of right knee pain. Plaintiff reported that the knee bothers her especially upon rotation or twisting but that there was no locking or giving way. Dr. Merkel noted plaintiff to be using a cane because of the pain. Dr. Merkel noted plaintiff to have had a severe crush-type injury to the lateral right tibial plateau with surgical intervention. Dr. Merkel further noted, however, that the articular surface showed collapse. Dr. Merkel noted that removal of the lateral buttress plate did not help appreciably. Upon examination, Dr. Merkel informed plaintiff that further surgical procedures could be performed to attempt re-correction of alignment or reconstruction, but plaintiff declined such procedures. Dr. Merkel informed plaintiff that over time, her knee condition could worsen and may require a total knee replacement. Plaintiff received a cortisone injection that same date and was instructed to follow up in three months. (Tr-I 250.)

Plaintiff returned to Dr. Fallah on January 21, 2003, and complained of some epigastric abdominal pain and continued weight gain. Plaintiff no longer experienced chest pain. Dr. Fallah noted plaintiff to have had significant improvement in her abnormal liver enzymes since her last evaluation. (Tr-I 578.) Upon review

of liver enzyme labs taken that same date, Dr. Fallah advised plaintiff to follow up in three months. (Tr-I 579.)

Plaintiff went to the Barnes-Jewish Hospital emergency room on March 14, 2003. (Tr-I 227-35.) Plaintiff complained of gout in her knee with infection, that she experiences pain as a result, and that the condition worsens when standing. Plaintiff reported that prior treatment has not been effective. Plaintiff also reported that she has had "real spacey episodes" intermittently for three or four weeks. Plaintiff reported that she woke up with a mark on her face that was caused by a demon. Plaintiff's history of bipolar disorder was noted. Plaintiff's affect was noted to be calm, depressed and flat. (Tr-I 234.) Prior to examination by a physician, plaintiff left the emergency department and was not treated. (Tr-I 227, 229, 231.)

On April 7, 2003, plaintiff returned to Dr. Merkel for follow up of her right knee and complained of additional pain in her left great toe. Plaintiff reported that Barnes-Jewish Hospital recently diagnosed her as having gout and started her on Colchicine.[51] Physical examination showed effusion of the right knee which Dr. Merkel opined was most likely osteoarthritic due to lateral compartment degenerative change. Dr. Merkel aspirated the knee and administered a cortisone injection. Cortisone was also

_____

[51]Colchicine is used to prevent or treat attacks of gout by reducing inflammation. Medline Plus (revised Jan. 31, 2994) <http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202160.html>.

injected to the left great toe.  Plaintiff was instructed to return in two to three weeks if the conditions had not improved.  (Tr-I 249.)

On May 15, 2003, plaintiff returned to Dr. Merkel and reported that she has had increased pain in her right knee, that she feels the knee is giving way, and that she uses a cane full time because of the condition.  Physical examination, coupled with examination of x-rays, showed significant degenerative osteoarthritis post traumatic with valgus deformity of the right knee.  Dr. Merkel opined that the only reasonable way to reconstruct the knee is with total knee replacement.  Plaintiff was administered a cortisone injection and was instructed to consider total knee replacement.  (Tr-I 248.)

Plaintiff returned to Dr. Fallah on June 5, 2003, who noted plaintiff to have gained nine pounds since January.  Plaintiff continued to complain of abdominal discomfort and reported that she was scheduled to undergo right knee replacement the following week.  (Tr-I 576.)  Dr. Fallah noted plaintiff's liver enzymes to have increased since January but determined to defer any further work-up until after plaintiff's knee replacement surgery.  Plaintiff was instructed to follow up in three to four months.  (Tr-I 576-77.)

Plaintiff was admitted to Missouri Baptist Medical Center on June 11, 2003, to undergo total right knee replacement.  (Tr-I 446-567.)  During the procedure, a question arose as to whether an

infection was present and the determination was made to abort the total knee replacement. The prepatellar bursa was irrigated and debrided, and granuloma material was removed. (Tr-I 468-69, 482.) Plaintiff was discharged on June 16, 2003, and was given antibiotics and Vicodin for pain. Plaintiff was instructed to follow up in three weeks. (Tr-I 448.)

Plaintiff visited Dr. Merkel on July 1, 2003, who informed plaintiff that no infection was present and that she could again be scheduled for knee replacement. (Tr-I 247.)

Plaintiff was admitted to Missouri Baptist on July 11, 2003, and underwent total right knee replacement on July 14, 2003. (Tr-I 316-445.) Plaintiff was discharged on July 17, 2003, at which time plaintiff's knee had range of motion of zero to ninety degrees and plaintiff was able to bear full weight. Plaintiff was given Vicodin for pain and plans were made for St. Louis Home Health Care to see her at home. Plaintiff was instructed to visit Dr. Merkel in three to four weeks for follow up. (Tr-I 318.)

Plaintiff visited Barnes-Jewish Hospital on July 29, 2003, for a psychiatric assessment. (Tr-I 212-15.) Dr. Daniel Mamah noted that plaintiff was seen at the Barnes-Jewish Psychiatry Clinic on May 27, 2003, by Dr. Kanchananakhin. Plaintiff's longstanding history of mood swings and multiple diagnoses were noted, including bipolar disorder, depression, major depressive disorder, somatization disorder, and cluster B personality traits. It was noted that plaintiff had attempted suicide on three

occasions, had multiple psychiatric hospitalizations at Barnes-Jewish, and was last hospitalized in August 2001.  Plaintiff's history of psychiatric medications was noted to include Haldol, Mellaril, Elavil, Thorazine, Serzone, Paxil, Prozac, Zyprexa, Effexor, Ativan, Xanax, Ambien, Valium, Trazodone, Risperdal, Belladonna, Seroquel, Amitriptyline, and Neurontin.  (Tr-I 212.) Plaintiff reported that these medications were not adequate for controlling her mood symptoms.  (Tr-I 212-13.)  Plaintiff reported that her condition had been followed by Dr. Lewis many years ago in the Psychiatry Clinic and that she had been seen in the Barnes-Jewish Wohl Clinic since April 2001 after a period of abstinence from the Clinic.  Plaintiff reported that she was currently doing well, was sleeping and eating well, and had no suicidal ideation. Plaintiff reported that she had been suffering panic attacks during the previous year and described sweating, feeling nervous and tremulous, and a sensation that she may collapse during such episodes.  Plaintiff reported that the episodes have a duration of five to ten minutes and that she may experience such episodes several times a day.  Plaintiff reported her last panic attack to have occurred four days prior.  Plaintiff reported that her mood symptoms have worsened since the September 11 tragedy in that she believes her son might have died during the attack.  Plaintiff reported that she had acted "weird" subsequent to her recent surgery but believed it to be related to the anesthesia and opioid pain medication.  It was noted that plaintiff was relatively stable

on her current medications. Dr. Daniel Mamah noted plaintiff's current medications to be Lithium, Prozac, Surmontil, and Clonazepam.[52] (Tr-I 213.) Physical examination showed plaintiff to periodically have pain in her right knee. No other abnormalities were noted. Mental status examination showed plaintiff to be cooperative and pleasant. Plaintiff had good psychomotor activity and good eye contact. Plaintiff had no suicidal or homicidal ideations and no delusions. Plaintiff denied any auditory or visual hallucinations. Plaintiff's flow of thought was noted to be sequential and logical. Plaintiff's mood was "fine" and her affect was described and euthymic and cheerful. Plaintiff's insight and judgment were noted to be good. Plaintiff appeared to have good recent and remote memory. (Tr-I 214.) Summarizing his examination, Dr. Mamah opined that plaintiff had

> a longstanding history of mood swings,
> difficulty with relationships, and recent
> onset of symptoms suggestive of panic attacks.
> On review of prior records and discussion with
> the patient, the mood symptoms did not appear
> to fit criteria for bipolar disorder or major
> depression as the mood symptoms typically
> lasted for several days. The patient's
> overall presentation is more suggestive of a
> cluster B personality disorder. In
> particular, her history of multiple
> relationship problems, often dramatic
> presentation of symptoms and history, frequent
> mood swings, and prior concentration and
> somatization disorder. The patient currently

---

[52]Clonazepam is indicated for the treatment of seizure disorders and panic disorders. <u>Physicians' Desk Reference</u> 2759 (55th ed. 2001).

> appears fairly stable, does not appear to be
> any particular risk to self or others.
> Further discussion with the patient and
> possibly collateral sources may clarify
> patient's diagnosis.

(Tr-I 214.)

Dr. Mamah diagnosed plaintiff with mood disorder, not otherwise specified; rule out bipolar disorder; rule out panic disorder; histrionic personality disorder, provisional; osteoarthritis; hypertension; and status post recent knee surgery. Dr. Mamah assigned a GAF score of 75. (Tr-I 212.) Plaintiff was instructed to continue with her medications and was given a one-month supply of all of her psychotropic medications. Plaintiff agreed to continue with treatment. Plaintiff was instructed to return in six weeks for re-evaluation. (Tr-I 215.)

An x-ray taken of plaintiff's right knee on July 31, 2003, showed status post right knee replacement with normal anatomic alignment. (Tr-I 315.) Dr. Merkel noted plaintiff to be doing well, specifically noting that plaintiff had been walking without a cane and was pleased with the results of surgery. Physical examination showed very good range of motion, good alignment, and good tracking of the patellofemoral mechanism. Dr. Merkel determined to start plaintiff on outpatient physical therapy and instructed plaintiff to return for follow up in two weeks. (Tr-I 246.)

On September 17, 2003, Dr. Mamah noted that plaintiff was

unable to make her appointment on September 9, 2003, because of a death in the family. Dr. Mamah refilled plaintiff's prescriptions for Lithium, Fluoxetine (Prozac), Surmontil, and Clonazepam. (Tr-I 204.)

Plaintiff visited Dr. Li subsequent to September 23, 2003, for follow up of abdominal pain and autoimmune cholangitis. (Tr-I 239-41.) Dr. Li noted plaintiff's recent medical history and further noted plaintiff's social situation and mental health to have improved. (Tr-I 239.) Dr. Li described plaintiff's mood as calm. (Tr-I 240.) Dr. Li noted plaintiff to have iron deficiency anemia for which she takes supplementation, and that plaintiff continues to undergo a protocol for osteoporosis. Plaintiff's chief complaint was noted to be excessive flatus. Dr. Li noted plaintiff's current medications to include Clonazepam, Lithium, Premarin, Norvasc, Atenelol, Aridia infusion, calcium, vitamin D, Prozac, Surmontil, vitamin B12 injections, and Albuterol inhaler. (Tr-I 239.) Upon physical examination and review of lab results and diagnostic testing, Dr. Li determined to try another course of antibiotics for possible small bowel bacterial overgrowth and Augmentin was prescribed. Dr. Li determined plaintiff's iron deficiency to probably be related to her gastric bypass surgery and continued plaintiff on iron supplementation. Dr. Li also questioned whether a stomach ulcer may be present. Dr. Li noted plaintiff to have chronic abdominal pain without change and that plaintiff was now trying the Atkins diet for weight loss. (Tr-I

240-41.) Plaintiff was instructed to return in one month for follow up. (Tr-I 241.)

Plaintiff returned to Dr. Merkel on October 7, 2003, for follow up of her right knee replacement. Plaintiff also reported that she had recently fallen and was experiencing pain in her right shoulder. Plaintiff reported that she was able to lift her arm and had no known weakness or loss of motion, but that she felt pain and a snap in the shoulder. (Tr-I 245.) An x-ray taken of the shoulder showed no acute fracture or dislocation. Post-operative changes were noted, however, presumably from a previous rotator cuff repair. (Tr-I 312-14.) Upon review of the x-ray and physical examination, Dr. Merkel opined that plaintiff probably had traumatic bursitis and a cortisone injection was administered. (Tr-I 245.) With respect to plaintiff's right knee, x-rays showed the knee replacement to be stable. Mild degenerative changes of the medial compartment of the left knee were likewise stable. (Tr-I 312-14.) Dr. Merkel noted plaintiff not to be having any problem with the knee and that she was quite pleased with the surgery. Dr. Merkel noted plaintiff to have good range of motion of the knee, intact ligamentous stability, and good tracking of the patellofemoral mechanism. Dr. Merkel determined plaintiff to be doing very well and released her from his care with respect to her knee condition. (Tr-I 245.)

Plaintiff visited Dr. Mamah on November 4, 2003, who noted plaintiff to have cancelled her last two clinic appointments

and had not been seen since July 2003. Plaintiff reported that her grandmother had recently died which made it difficult for her to come to appointments. Plaintiff reported increased panic attacks, describing unprovoked periods of palpitations, sweating and anxiety. Plaintiff reported no significant mood symptoms. Dr. Mamah noted plaintiff to be currently taking Lithium, Prozac and Surmontil. Mental status examination showed plaintiff to be cooperative and pleasant. Plaintiff had normal psychomotor activity. Plaintiff had no suicidal or homicidal ideations and no hallucinations or delusions. Plaintiff's flow of thought was noted to be sequential and logical. Plaintiff's mood was "good" and her affect was described as euthymic, smiling periodically. Plaintiff's insight and judgment were noted to be good. Plaintiff appeared to have good recall of recent and past events. Dr. Mamah diagnosed plaintiff with mood disorder, not otherwise specified – rule out bipolar affective disorder; hypertension; and osteoarthritis. Dr. Mamah opined that plaintiff's anxiety attacks may be a side effect of Surmontil inasmuch as plaintiff had been taking a higher dose than expected. Dr. Mamah questioned whether plaintiff's previous diagnosis of panic disorder may have been due to this pathology. Dr. Mamah noted plaintiff to have mixed up dosages of medication and suggested that the medication regimen be simplified if possible. Dr. Mamah noted that, otherwise, plaintiff was stable with no significant mood symptoms and no physical symptoms. Plaintiff was instructed as to the proper dosage of

Surmontil and was instructed to continue with Prozac and Lithium. Plaintiff was instructed to return in one month. (Tr-I 189.)

On November 14, 2003, plaintiff reported to Dr. Merkel that she continued to have pain in her right shoulder with some weakness. Dr. Merkel reviewed an MRI taken some weeks prior and determined that plaintiff suffered a re-tear of the rotator cuff. After consultation with plaintiff, it was decided that Dr. Merkel would not proceed with surgical repair of the rotator cuff but would instead send plaintiff to physical therapy. (Tr-I 244.)

In a Minor Procedures Center Profile completed November 18, 2003, at Barnes-Jewish Hospital, it was reported that plaintiff experienced throbbing pain in her right shoulder, arm and back which she described to be at a level four on a scale of one to ten. Plaintiff reported suffering from bipolar disorder as well as post traumatic disorder. Plaintiff's other conditions of depression, hypertension, GERD, hepatitis, anemia, osteoporosis, and osteoarthritis were also noted. (Tr-I 252-54.)

On December 29, 2003, plaintiff returned to Dr. Merkel and reported worsening pain in her right shoulder and a noticeable limitation of motion. Physical examination showed weakness to shoulder abduction external rotation and positive impingement sign. It was determined that plaintiff would undergo surgical repair of the rotator cuff. (Tr-I 243.)

Plaintiff was admitted to Missouri Baptist on January 7, 2004, for right rotator cuff repair. (Tr-I 256-307.) It was noted

that plaintiff had had right rotator cuff repair two years prior but that she had sustained a new injury and a re-tear of the rotator cuff. The torn rotator cuff was repaired with reinforcement using graft jacket. (Tr-I 262-63.) Plaintiff was discharged on January 8, 2004, and was instructed to return to Dr. Merkel in ten days for follow up. (Tr-I 257, 258.)

On January 22, 2004, plaintiff reported to Dr. Merkel that she was feeling well and that her pain was definitely better. Plaintiff reported that she continued to have some soreness but that she has been increasing motion to the shoulder. Physical examination showed mildly positive impingement sign and fairly good strength to initiation of abduction external rotation. Dr. Merkel opined that plaintiff was doing very well following rotator cuff repair and instructed plaintiff to continue with her exercises. Plaintiff was given Vicodin for pain and was instructed to return in four to six weeks for follow up. (Tr-I 242.)

Plaintiff was admitted to the emergency department at St. Mary's Health Center on July 12, 2004, complaining of weakness, tingling hands and tightening of the mouth. (Tr-I 158.) Plaintiff reported having muscle spasms in her hands extending to her upper extremities, and also in the lower extremities. Plaintiff had no other complaints. (Tr-I 164.) Plaintiff's medical history and current medications were noted. (Tr-I 158, 164.) Plaintiff reported that she had been drinking GoLYTELY in preparation for an upper and lower endoscopy she had scheduled for that day. (Tr-I

164.)  Plaintiff was given Benadryl, Ativan, calcium gluconate, potassium, and magnesium oxide.  (Tr-I 163.)  Plaintiff was discharged that same date with instructions to follow up with Dr. Epstein at the Barnes-Jewish Clinic in two or three days.  (Tr-I 158.)

## VI.  Discussion

As set out _supra_ at Section II, the ALJ determined that plaintiff was not under a disability at any time through the date of his decision, specifically finding that during the period of September 28, 1998, through November 5, 2001, plaintiff had the RFC to perform her past relevant work as a secretary; and that since November 6, 2001, plaintiff had the RFC to perform other work existing in significant numbers in the national economy.

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared

disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a severe impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to

disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts

from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068(8th Cir. 2000)). The Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome or because another court could have decided the case differently. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003); Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically, that the ALJ erred by relying too heavily on plaintiff's GAF scores in determining plaintiff's mental impairments not to be disabling; that the ALJ failed to accord appropriate weight to the opinion of Dr. Lewis and failed to undergo the analysis required by the regulatory framework in discrediting Dr. Lewis' opinion; and that the ALJ failed to properly consider Dr. Mamah's treatment notes and records in determining plaintiff's only non-exertional limitation post-November 5, 2001, to be that she engage in only less-than-occasional contact with the general public.[53]

---

[53]To the extent plaintiff argues that the ALJ was too vague in his determination that plaintiff's only non-exertional limitation on and prior to November 5, 2001, was to avoid highly stressful environments, this Court is barred from revisiting the issue under

A.   <u>Global Assessment of Functioning</u>

        Plaintiff  argues  that  in  finding  plaintiff's  mental
impairments not to be disabling, the ALJ improperly relied on the
GAF  scores  assigned  to  plaintiff  by  various  treating  and/or
examining physicians.   Plaintiff contends that because GAF scores
are  purely  subjective  in  nature,  the  ALJ's  reliance  thereon
improperly failed to take into account objective medical evidence
of  plaintiff's  impairments.    A  review  of  the  ALJ's  decision,
however,  belies  plaintiff's  assertion  that  the  ALJ  improperly
relied on GAF scores to find plaintiff's mental impairments not to
be disabling.

        In  his  opinion,  the  ALJ  recited  plaintiff's  complaints
that  she  has  been  unable  to  work  because  of  depression  and  panic
attacks, claiming that doing several things at once induces stress,
that  she  can  stay  on  task  for  only  thirty  minutes  at  a  time,  that
she  cannot  tolerate  crowds,  and  that  she  becomes  frustrated  with
details.   (Tr-I 8-9.)   Summarizing  all  the  medical  evidence  of
record relating to plaintiff's mental impairments, however, the ALJ
determined  that  such  evidence  failed  to  support  plaintiff's
contentions.    (Tr-I 9-10.)   In  doing  so,  the  ALJ  noted  that  GAF
scores  assigned  by  various  physicians  throughout  plaintiff's
treatment  appeared  to  run  counter  to  plaintiff's  claims  of
debilitating limitations.  (<u>Id.</u>)  While the ALJ considered such GAF

_____

the  law  of  the  case  doctrine,  as  discussed  <u>supra</u>  at  Section  III.

scores, a review of the ALJ's decision shows him to have also thoroughly considered the objective findings and other observations made by these physicians:

> The medical record shows that the claimant has a history of an affective disorder that pre-dates September 1998, the diagnosis initially being major depression, then a bipolar disorder. Yet, mental status evaluations conducted by a treating psychiatrist, Collins Lewis, M.D., during the September 1998 to February 2000 period had normal results on all occasions but three; and the only "abnormality" noted on those three occasions was that the claimant was less talkative and/or was subdued. In April 2000, Dr. Lewis increased the dosage of the claimant's Wellbutrin, apparently because of new stressors; namely, deaths in the claimant's family. Yet, the medical record does not show any treatment by Dr. Lewis in the post-May 2000 period. In October 2000, Dr. Lewis opined that the claimant had a marked limitation in her ability to cope with stress, and further opined that she had a substantial loss of ability to respond appropriately to supervision, co-workers and usual work situations, as well as a substantial loss of ability to deal with changes in a routine work setting. . . .

> Additionally, Harry Deppe, Ph.D., conducted a consultative evaluation of the claimant in May 2000 . . . [the results of which showed] the claimant: had a somewhat anxious mood but a generally normal affect; had no unusual thought disturbances; had no difficulty understanding what was said to her; was oriented to time, place and person; had no difficulty with recall other than some difficulty recalling activities in the past three days; could perform serial sevens without error (a test of concentration); had unremarkable judgment and insight; and did not have any suicidal or homicidal ideation.

> The claimant was hospitalized for a brief
> period in August 2000, after disclosing
> suicidal statements to friends, but Luis
> Giuffran, the attending doctor, noted that the
> disclosures were in the context of heavy
> alcohol use. . . .
>
> The mental treatment record is essentially
> silent in 2001 and 2002. In July 2003 Daniel
> Mamah, M.D., evaluated the claimant[.] . . .
> Dr. Mamah noted that the claimant was alert
> and oriented times four, had good recent and
> remote memory, had a fine mood and euthymic
> affect, had a regular rate and rhythm in her
> speech, logical and sequential flow of
> thought, had good insight and judgment, had
> normal psychomotor activity, and did not have
> suicidal ideation or psychosis. Dr. Mamah
> reported similar evaluation results in
> November 2003.

(Tr-I 9-10.) (Internal citations omitted.)

The undersigned is aware of no authority, and plaintiff
cites to none, which counsels against consideration of a claimant's
GAF scores in determining the extent to which the claimant may
engage in work related functions. Nevertheless, as demonstrated
above, the ALJ here thoroughly discussed and analyzed the objective
and subjective medical evidence of record and determined that
plaintiff's mental impairments did not limit plaintiff to such a
degree so as to render her disabled on account thereof. Including
plaintiff's GAF scores in such an analysis was not error. See Goff
v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).

B.    Weight of Treating Physician's Opinion

Plaintiff argues that the ALJ erred in not according
greater weight to the opinion of plaintiff's treating psychiatrist,

Dr. Lewis, and in failing to set out appropriate reasons for discrediting his opinion.

The Regulations require the Commissioner to give more weight to the opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

As such, evidence received from a treating physician is generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians. See Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991).

Opinions of treating physicians do not *automatically* control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In this case, the ALJ determined to accord slight weight to that portion of Dr. Lewis' October 2000 Mental Medical Source Statement (MSS) in which he opined that plaintiff had a marked limitation in her ability to cope with stress; that she had a substantial loss of ability to respond appropriately to supervision, co-workers and usual work situations; and a

substantial loss of ability to deal with changes in a routine work setting.  In discrediting these opinions, the ALJ found them to be

> grossly inconsistent with the doctor's own treatment notes[.]  The opinions are also internally inconsistent:  in the same report in which the doctor made these opinions, he put the claimant's global [assessment of] functioning at 61 currently, and 70 in the past year.  These scores denote only mild symptoms and that the individual is generally functioning well.

(Tr-I 9.)  (Internal citations omitted.)

For the following reasons, substantial evidence on the record as a whole supports the ALJ's determination to accord little weight to these opinions.

A review of the record shows that prior to September 1998, Dr. Lewis noted during various appointments that plaintiff's depression had improved and that she was euthymic and cheerful. Increased anxiety was noted to be related to isolated and profound stressors, namely, significant difficulties with the principal for whom she worked and the deaths of three friends.  With respect to the period between September 1998 and February 2000, the ALJ noted that Dr. Lewis continually found plaintiff's mental status to be normal, except on three occasions when plaintiff appeared subdued or less talkative.  The undersigned further notes that plaintiff's medications were adjusted during this period, and, indeed, in some instances decreased because of improved symptoms. Finally, the ALJ noted in his decision that Dr. Lewis determined to increase the

dosage of plaintiff's medication in April 2000 because of increased stressors, and specifically, deaths in the family, and that the record showed no treatment by Dr. Lewis subsequent to this event.

A review of the record shows the ALJ's determination to accord slight weight to certain of Dr. Lewis' opinions not to be error inasmuch as Dr. Lewis did not provide any support for his opinions of disabling limitations and further, as found by the ALJ, such opinions are inconsistent with his own findings and observations made throughout his treatment of plaintiff. An ALJ's decision to discount a treating physician's MSS is not error where the limitations listed therein "stand alone" and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning." See Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001); see also Randolph v. Barnhart, 386 F.3d 835, 841 (8th Cir. 2004) (only evidence that claimant met criteria for disability was treating source's cursory checklist); Sultan v. Barnhart, 368 F.3d 857, 863-64 (8th Cir. 2004) (no error in rejecting treating physician's statement that claimant had no real ability to function in numerous areas relevant to employment given evidence in treatment notes that claimant was doing well on medication and was functioning at a reasonable level at school and at home); Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004) (affirming ALJ's decision to give little weight to MSS where physician's opinion was "without explanation or support from clinical findings" and "not internally consistent with [his]

own treatment notations."). The ALJ also found Dr. Lewis' Mental MSS to be inconsistent within itself inasmuch as although Dr. Lewis opined that plaintiff had marked limitations and/or substantial loss of ability to function in various domains, he nevertheless concluded that plaintiff's GAF score was 61 currently and 70 during the previous year, which, as noted by the ALJ, demonstrates only mild symptoms according to the Diagnostic and Statistical Manual of Mental Disorders. See Goff, 421 F.3d at 791 (ALJ not compelled to give controlling weight to treating psychiatrist's opinion that claimant suffered extreme limitations where such opinion was "starkly inconsistent" with his finding that claimant's GAF score was 58, indicating moderate symptoms). In addition, the limitations set out by Dr. Lewis are inconsistent with other substantial evidence in the record, including observations and reports of other examining physicians as well as plaintiff's own account of vacationing in Cancun, caring for an individual with Alzheimer's disease, and arranging and coordinating gambling trips as a means to generate income. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (for opinion of treating physician to be given controlling weight, it must not be inconsistent with other substantial evidence in the record).

As demonstrated above, the ALJ gave good reasons to give little weight to those portions of Dr. Lewis' October 2000 Mental MSS which were inconsistent with other evidence of record and with Dr. Lewis' own observations and reports, and thus did not err in

this determination.  If two inconsistent positions may be drawn from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the decision.  <u>Goff</u>, 421 F.3d at 789.

C.    <u>Consideration of Treatment Record of Dr. Mamah</u>

Plaintiff claims that the ALJ's determination that her only non-exertional limitation post-November 5, 2001, was a social limitation – that is, that she engage in less-than-occasional contact with the general public – failed to take into account the treatment records of Dr. Mamah which showed plaintiff's history of continuous limitations due to stress for which treatment had provided only stability and not mental health for plaintiff.

A review of the record shows Dr. Mamah to have examined plaintiff on one occasion in July 2003 and on another occasion in November 2003.  In his treatment notes with each examination, Dr. Mamah summarized the nature of plaintiff's complaints as reported to him by plaintiff, his current observations of plaintiff, and his prescribed treatment and reasons therefor.  The ALJ noted in his written decision that plaintiff's mental treatment record was "essentially silent" in 2001 and 2002 and that Dr. Mamah's observations of plaintiff in July 2003 showed that plaintiff was

> alert and oriented times four, had good recent
> and remote memory, had a fine mood and
> euthymic affect, had a regular rate and rhythm
> in her speech, logical and sequential flow of
> thought, had good insight and judgment, had
> normal psychomotor activity, and did not have

85

suicidal ideation or psychosis.

(Tr-I 10.) (Internal citation omitted.)

The ALJ noted Dr. Mamah to have made similar findings in November 2003. (Id.)

A review of the ALJ's decision shows him to have summarized and discussed Dr. Mamah's observations of plaintiff's functioning at the time of her visits with him in July and November 2003. To the extent plaintiff argues that the ALJ erred in failing to acknowledge Dr. Mamah's notes of plaintiff's mental health *history* which showed plaintiff's "ongoing, continuous trouble dealing with stress over a period of years, during which consistent treatment has provided Plaintiff only stability, not health, and over which she has been unable to hold a job" (Pltf.'s Brief at p. 22), the undersigned notes that Dr. Mamah's recitation of such history was based on plaintiff's subjective report to him of her past condition and symptoms. An ALJ does not err in according little or no weight to the opinion of a physician where the physician's diagnoses and impressions are based largely on the claimant's subjective complaints, found not to be credible. See Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005).[54]

---

[54]Although plaintiff does not challenge the ALJ's credibility determination here, a review of the ALJ's decision nevertheless shows that, in a manner consistent with and as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly considered the subjective allegations of plaintiff's disabling symptoms on the basis of the entire record before him and set out numerous inconsistencies detracting from the

In addition, plaintiff challenges the ALJ's statement that the record regarding plaintiff's mental health treatment was "essentially silent" in 2001 and 2002, arguing that such a statement implies that plaintiff did not receive treatment during this period and thus fails to consider Dr. Mamah's notes regarding such treatment. Other than plaintiff's report to Dr. Mamah that she received treatment during this time, the record is devoid of any evidence demonstrating that plaintiff indeed received mental health treatment during 2001 and 2002 other than social counseling she received during her stay at Town and County in May and June 2002 while she underwent physical rehabilitation from knee surgery.

The claimant bears the burden of furnishing to the Commissioner specific medical evidence showing the existence of an impairment and its severity during the time she claims she is disabled. 20 C.F.R. §§ 404.1512(a), (c), 404.1514; 20 C.F.R. §§ 416.912(a), (c), 416.914. In the event a claimant fails to submit such medical evidence, the Commissioner will make a determination based on the information available in the case. 20 C.F.R. §§ 404.1516, 416.916. In this cause, the ALJ accurately noted that the record was essentially silent with respect to any mental health

---

credibility of such allegations. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992).

treatment sought and/or received by plaintiff in 2001 and 2002. Although the plaintiff argues that Dr. Mamah's notes from July 2003 reflect such treatment, there nevertheless is no specific medical evidence which shows the severity of plaintiff's mental impairment during 2001 and 2002. Plaintiff's subjective statements that she suffered debilitating symptoms during this period, with nothing more, is an insufficient basis upon which to find plaintiff disabled during that time. See 20 C.F.R. §§ 404.1528(a), 416.928(a).

In July and November 2003, Dr. Mamah noted plaintiff to be doing well, that she was sleeping and eating well, had no suicidal ideation, and was stable on her medications. Dr. Mamah noted plaintiff to be euthymic and cheerful, cooperative and pleasant, and exercising good insight and judgment. Dr. Mamah questioned whether plaintiff's recent episodes of panic attacks were due to medication dosages rather than a psychiatric disorder, and simplification of plaintiff's medication regimen was implemented. These observations do not show plaintiff to have been suffering from stress at such a time for which she could not obtain health and because of which she could not be employed. Indeed, in November 2003, Dr. Mamah noted plaintiff to have no significant mood symptoms. With these observations, coupled with the lack of specific medical evidence demonstrating otherwise, the ALJ did not err in finding that plaintiff's only non-exertional limitation post-November 5, 2001, was that she be restricted to only less-

88

than-occasional contact with the general public.

## VII.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome, or because another court could have weighed the evidence or decided the case differently.  Tellez v. Barnhart, 403 F.3d 953, 958 (8th Cir. 2005); Gowell, 242 F.3d at 796; Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).  Accordingly, the decision of the Commissioner should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that they have to and including **August 14, 2006,** by which to file written objections to this Report and Recommendation.  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  Thompson v.

Nix, 897 F.2d 356, 357 (8th Cir. 1990).


_____
UNITED STATES MAGISTRATE JUDGE



Dated this  _2nd_  day of August, 2006.